**STATE of Alaska, Petitioner,**

v.

**Donald McDONALD, Respondent.**

**Donald McDONALD, Appellant,**

v.

**STATE of Alaska, Appellee.**

Nos. A–2185, A–2211.

Court of Appeals of Alaska.

April 12, 1994.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for petitioner and appellee.

Lisa Rieger, Anchorage, for respondent and appellant.

Before BRYNER, C.J., COATS, J. and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Donald McDonald was tried by a jury for kidnapping and first-degree murder. The jury convicted McDonald of kidnapping but deadlocked on the murder charge. Following a retrial, another jury convicted McDonald of first-degree murder. The superior court sentenced McDonald to ninety-nine years in prison on the murder charge, but declined to impose a sentence for the kidnapping. McDonald appeals, challenging his convictions on various grounds and alleging that the superior court erred in denying a post-trial motion for a new trial based on newly discovered evidence. The state opposes McDonald's challenges and, in addition, seeks review of the superior court's refusal to sentence McDonald on the kidnapping con-

viction. We affirm the superior court's rulings on all issues.

## FACTS

### 1. *The Victim*

McDonald's convictions stem from the 1986 abduction and murder of Laura Henderson, crimes that appear to have resulted from the breakup of Henderson's marriage to Kodiak resident Jack Ibach and the ensuing dispute over custody of Henderson and Ibach's two daughters. Henderson and Ibach were married for approximately seven years; they lived in Kodiak with their two daughters. In 1985, however, Henderson and Ibach separated, and Ibach filed for divorce. Henderson moved into an apartment in Kodiak with the two children and began working for the Kodiak Women's Resource Crisis Center. She retained attorney Matthew Jamin to assist her in the divorce proceedings.

A partial divorce decree was granted in February of 1985, but Henderson and Ibach were evidently unable to agree on custody of the children. They had discussed alternating custody every few weeks, but, as the dispute continued, each decided to seek sole custody of the girls. Trial on the issue of custody was scheduled for July of 1986. By March of 1986, the dispute over custody had become acrimonious. Ibach apparently feared that Henderson would continue to litigate until she was granted sole custody.

### 2. *The Setup*

On March 28, 1986, a man telephoned Henderson at the Center and made an appointment to see her. At approximately 3:00 p.m., Donald McDonald appeared at the Center. McDonald introduced himself to Henderson, who then took him upstairs to a conference room. McDonald left approximately ten minutes later.

After McDonald left, Henderson told coworkers Suzanne Hinson, Janet Carter, and Cathy Wilson that McDonald had offered her information she could use against Ibach in their custody dispute. Henderson seemed ecstatic about the opportunity to improve her

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

chances of gaining full custody of her children. She told her co-workers that she planned to meet McDonald near the King Crab Cannery at 9:00 p.m. that evening; there, McDonald was to give her a tape with information that would incriminate Ibach. Henderson told Wilson that she would call her after the meeting.

After leaving work, Henderson went to the office of her attorney, Jamin, to tell him about the information she expected McDonald to give her that evening. Jamin was skeptical and contacted a private investigator, Albert Ruble. After talking to Henderson, Ruble feared that the 9:00 p.m. meeting might be a setup. Ruble and Henderson agreed that Ruble would accompany Henderson to the meeting site at the King Crab Cannery and would maintain surveillance from a nearby hidden location. Henderson then went home.

That evening, Catherine Munro, Henderson's mother, came to Henderson's apartment to watch the girls while Henderson met with McDonald. Before leaving her apartment, Henderson assured her mother that she would call at 9:30 p.m. to let her know when she would be home. To get to her meeting with McDonald, Henderson had borrowed a car from a friend, Debra Sundberg. Henderson had arranged to pick Sundberg up later that night, after Sundberg finished her work shift at midnight.

### 3. *The Abduction*

Upon leaving her apartment shortly before 9:00 p.m., Henderson drove to the designated meeting place at the King Crab Cannery. On her way to the cannery, she passed by Ruble, who awaited her at a prearranged location in his own car. When Henderson went by, Ruble started his car and drove after her. As Ruble approached the cannery, he saw Henderson's car parked at the side of the road, behind a white van. As he proceeded past the van, Ruble could see Henderson inside. He also saw at least one other person in the van with her.

Ruble drove out of view, parked his car, and returned on foot, hoping to find a con-

cealed vantage point from which he could keep watch over Henderson and the van.

The van was out of Ruble's sight for less than a minute before he reached his vantage point; nevertheless, by that time, the van had disappeared. Ruble could see Henderson's car, still parked on the street, empty. He quickly searched the area but found no sign of Henderson or the van. Ruble immediately reported Henderson's disappearance to the police, giving them a detailed description of the van, including its license plate number.

### 4. *The Search*

After reporting Henderson's disappearance to the police, Ruble began a night-long search for Henderson and the white van. Jamin and Henderson's parents joined in the efforts. By checking the Department of Motor Vehicle license records, the police determined that the white van belonged to McDonald. At approximately 1:00 a.m., Henderson's stepfather spotted McDonald's van parked near McDonald's residence and reported its location to the police.

Shortly after 4:00 a.m., Kodiak Police Corporal John Palmer, accompanied by Ruble, arrived at McDonald's residence to investigate. McDonald came to the door. Palmer announced that he was investigating a report of a missing person and asked if McDonald knew Laura Henderson. McDonald became quite nervous: his hands shook, he avoided making eye contact, and his voice quivered. Looking "quizzically" at Palmer, he denied knowing a Laura Henderson. Palmer then "countered with ... Laura Ibach." McDonald looked at Palmer "again kind of quizzically and ... told [Palmer] he knew Jack Ibach, and was that Jack's wife." When Palmer said that she was, McDonald denied having "any contact with her. Didn't know her."

At that point, however, Palmer confronted McDonald with the information that his van had been under surveillance earlier that night. McDonald then admitted that he knew Henderson and acknowledged meeting with her, but claimed that she had spent only a few moments in the van before she left. However, when Palmer revealed that Mc-

Donald had been seen leaving the cannery area with Henderson still inside his van, McDonald acknowledged driving away with Henderson, but insisted that he had merely taken her around the block before letting her out. Nevertheless, McDonald refused to say exactly where Henderson had exited the van.

As Palmer left McDonald's residence he passed by McDonald's van and noticed that there appeared to be someone inside. In the van, Palmer found James Kerwin, a friend of McDonald, sleeping. Since a warrant had been issued for Kerwin's arrest on unrelated charges, Palmer took Kerwin into custody. McDonald was arrested in connection with Henderson's disappearance later that day.

Henderson was never seen or heard from again after her disappearance from the cannery in McDonald's van. All further efforts to locate her proved futile. Although Henderson was known to be punctual and reliable, she failed to call her co-worker Cathy Wilson as she had promised. The car that Henderson had borrowed from Debra Sundberg remained at the cannery, where Henderson had parked it; Henderson did not pick Sundberg up after work or contact her about the borrowed car. Henderson did not show up at work to claim her March paycheck. She never contacted her friends, co-workers, or parents again; nor did she ever return home to her daughters.

### 5. The Investigation

The investigation of Henderson's disappearance initially implicated McDonald as her abductor. As the investigation progressed, however, evidence soon indicated that Kerwin and Ibach were also involved.

#### a. Physical Evidence

McDonald was arrested on March 29, 1986, the day after Henderson disappeared. The police found three knives on his person. He also had a passport in his possession that had been issued to him only a few weeks before.

That same day, the police obtained and executed a search warrant for McDonald's van. The police found that the van's cargo door window was broken. They were able to establish that the window had been broken from the inside shortly before the van was seized; the break was consistent with one caused by the impact of a body part.

Inside the van, the police found two firearms: a .30–caliber rifle and a loaded .32–caliber revolver. The van's interior was dirty and wet; nevertheless, the police discovered two very small, dry feathers on the floor. Forensic analysis later indicated that one of the feathers had likely come from a down coat Henderson was wearing on the night of her disappearance.

The police also found the back of a post earring in the van. A later search yielded the front portion of the earring. The earring was identified as one that Henderson wore when she left her home to meet with McDonald.

The police seized an Instamatic camera from the van; the camera contained film that had been exposed. By developing the film, the police obtained photographs depicting McDonald and Kerwin outside of a cabin. The police eventually discovered that this cabin was located at the end of Monashka Bay Road, near the town of Kodiak. During the months following Henderson's disappearance, numerous items belonging to Henderson, including her wallet, pink tennis shoes, a full-length down coat, a belt, and jeans, washed up along the shoreline of Monashka Bay, below the cabin site. Henderson's body, however, was never found.

#### b. Additional Witnesses

In the course of their investigation, the police spoke with various witnesses who tended to link McDonald to Henderson's abduction. Colleen Jones told the police that a white van matching the description of McDonald's emerged from a parking lot near McDonald's residence at approximately 9:35 on the evening of March 28, 1986—within minutes of the time of Henderson's abduction. The driver pulled out directly in front of Jones, swerving all over the road.

Dan Merrigan reported spotting a van of similar description near Monashka Bay approximately ten or fifteen minutes later. According to Merrigan, between 9:45 and 10:00

p.m. on the evening of the abduction, he saw the van coming from the direction of Kodiak, driving down the middle of the roadway near the end of Monashka Bay Road.

The police discovered that McDonald had been planning to contact Henderson even before March 28, 1986. Ruth Evans, a friend of McDonald, reported that two days before Henderson disappeared, McDonald told her he knew Henderson and asked Evans how to arrange a visit at the Center. According to Evans, McDonald wanted to confirm that "anybody could go up and see anybody" at the Center.

Police subsequently spoke with Gladys Baldwin, the manager of the half-way house where McDonald lived. Baldwin told the police that, soon after the police had questioned McDonald on the night of Henderson's disappearance, McDonald handed her a .357–caliber revolver that was wrapped in a paper bag. McDonald asked Baldwin to "hold it" for him, claiming that it belonged to Kerwin and insisting that "it has nothing to do with anything." Baldwin disclosed that she had placed the gun in a dumpster after learning of McDonald's arrest, but had retrieved it two days later. Baldwin said she subsequently gave the gun to a friend of McDonald. The police eventually contacted McDonald's friend, JoAnn McKee, who still had the gun and surrendered it to them.

Baldwin also provided the police with valuable information about the photographs from the camera that the police had seized from McDonald's van. Baldwin explained that the photographs were taken during an excursion by McDonald and Kerwin to the Monashka Bay area. According to Baldwin, McDonald and Kerwin were friends and saw each other frequently. About two weeks before Henderson's disappearance, McDonald and Kerwin wanted to drive out to the end of Monashka Bay Road to look for a cabin. Baldwin and her young son had decided to accompany them. Baldwin did not know why McDonald was interested in finding the cabin. She said that the photographs were taken after the group had arrived at their destination.

Baldwin further established a link between Kerwin and Jack Ibach, telling the police that Kerwin had introduced Ibach to her approximately a week and a half before Henderson disappeared. Other witnesses fortified the connections between McDonald, Kerwin, and Ibach. The police learned that Peter Malley, who lived behind the house where Kerwin was staying, had seen Ibach and McDonald together shortly before Henderson disappeared; each had also been watching Henderson's apartment within days of her disappearance. Malley had also observed Ibach visiting Kerwin several times during the month preceding Henderson's disappearance. McDonald, Kerwin, and Ibach had all been seen together on at least one occasion by Malley.

A friend of Ibach, Marjorie Holden, informed the police of several statements by Ibach suggesting that he had planned to kill Henderson. Holden told the police that, prior to Henderson's abduction, Ibach said he wished Henderson would "disappear." Holden reported that Ibach mentioned several possible ways of killing Henderson. Ibach told Holden that he would not be caught because "if there was no body there was no crime."

Holden specifically recalled that on one occasion Ibach told her he had talked to "someone" who would make Henderson "just disappear." Holden said that Ibach told her he planned to pay the person out of a $14,000 payment he expected to receive in the near future. According to Holden, Ibach described the person he had talked to as an older man whose son lived in a mission; Ibach was sure the man would not be concerned about getting caught since he had serious health problems and did not have long to live.

The police realized that Ibach's statement, as related by Holden, appeared to describe Kerwin. Investigation confirmed that Ibach had in fact expected to receive a $14,000 payment from his pension account in February of 1986. The police also located a notebook belonging to Kerwin, in which Kerwin had written a partial telephone number that appeared to be Ibach's.

The police also spoke to Lynn Hutcherson, another acquaintance of Ibach. Hutcherson

described an occasion, which had occurred about a month before Henderson disappeared, when Ibach mentioned that his custody battle was getting "sticky," and stated that he wished Henderson would "just disappear." Ibach told Hutcherson not to "be surprised if [Henderson] just turns up missing some day." A week or two later, Ibach asked if Hutcherson knew of any way to find a "hitman," or if Hutcherson or any of Hutcherson's friends had ever used one. Hutcherson also told the police that almost immediately after Henderson disappeared, Ibach telephoned him several times, asking Hutcherson to keep their previous conversations confidential.

The police additionally learned from Nancy Frost, a travel agent in Kodiak, that, shortly before Henderson's disappearance, Ibach had asked Frost about arranging a trip to Asia in April. Frost told the police that Ibach inquired about the April airline fare to Bangkok, Thailand, and told her that two of his friends were traveling by ship and would meet him there. Before Ibach left the travel agency, he asked Frost not to tell anyone that he had come in.

Finally, Ibach's friend John Kostal provided the police with information directly linking Ibach to the .357–caliber revolver that McDonald gave Baldwin the night of Henderson's abduction. Kostal reported that Ibach had given him a handgun about a month before Henderson disappeared. According to Kostal, less than a week before the disappearance, Ibach asked Kostal to return the gun, saying that he was concerned that it might be stolen. At Ibach's request, Kostal returned the gun.

After Kostal reported this information, the police showed him the revolver that Baldwin had received from McDonald immediately after the abduction. Kostal identified the revolver as the same gun that Ibach had given him and then taken back shortly before Henderson disappeared.[1]

## PROCEEDINGS

Based on evidence collected during the investigation of Henderson's disappearance, a Kodiak grand jury indicted McDonald, Ibach, and Kerwin on charges of first-degree murder and kidnapping.

Prior to trial, McDonald moved to dismiss his indictment, alleging insufficient evidence to support the charges, as well as various procedural errors. McDonald also moved to sever his trial from Ibach and Kerwin's, primarily on the ground that he would be prejudiced by the introduction of various hearsay statements made by Ibach that might be admissible against Ibach, but would be inadmissible against McDonald. In addition, McDonald moved to suppress the evidence seized from his van, claiming that the warrant for the van was not supported by probable cause and that a second, warrantless search of the van was unlawful.

The superior court denied these motions; McDonald was tried jointly with Ibach and Kerwin before an Anchorage jury in November of 1986. The jury convicted McDonald of kidnapping, but deadlocked on the murder charge. The jury also deadlocked as to both charges against Ibach and acquitted Kerwin altogether.

McDonald and Ibach were retried jointly in April of 1987. Since Kerwin had been acquitted at the first trial, the state called him as a witness at the second trial. The second jury convicted McDonald on the unresolved first-degree murder charge and convicted Ibach of both kidnapping and murder. The superior court sentenced McDonald to a maximum term of ninety-nine years' imprisonment for murder but declined to impose a sentence on the kidnapping conviction, ruling that, under the circumstances of the case, the kidnapping conviction merged with McDonald's conviction for murder.

McDonald filed this appeal, challenging his conviction on various grounds. The state contemporaneously petitioned for review of the superior court's ruling that McDonald's murder and kidnapping charges merged.

---

1. By the time the gun that McDonald had given Baldwin was shown to Kostal, McDonald's first trial had already concluded. Thus, Kostal's testimony about recognizing the gun McDonald gave Baldwin was only presented at McDonald's second trial.

We granted the state's petition and consolidated the merger issue with McDonald's appeal. While his appeal was pending, McDonald moved for a new trial, alleging newly discovered evidence. After holding several evidentiary hearings, the trial court denied McDonald's new-trial motion. McDonald appealed the ruling; the issue was added to the already-pending appeal.

## MCDONALD'S APPEAL

### 1. *Motion to Dismiss the Indictment*

McDonald first contends that the superior court erred in failing to dismiss his indictment. He renews many of the arguments he raised below and adds several new arguments.

### a. Standard of Review

▐ The decision to deny a motion to dismiss an indictment is committed to the trial judge's discretion and will not be overturned absent an abuse of discretion. *Sheldon v. State,* 796 P.2d 831, 834 (Alaska App. 1990). Under Alaska Criminal Rule 6(q), a "grand jury shall find an indictment when all of the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant." Criminal Rule 6(r)(1) permits the prosecutor to present to the grand jury any evidence that "would be legally admissible at trial." If inadmissible evidence is presented, however, the indictment will be vitiated only "if the remaining evidence was insufficient to support [the] indictment or the improper evidence was likely to have had an overriding influence on the grand jury's decision." *Boggess v. State,* 783 P.2d 1173, 1176 (Alaska App.1989).

### b. Grand Jury Bias

▐ McDonald argues that he was denied a fair and impartial grand jury because several grand jurors were acquainted with Henderson, the defendants, and various grand jury witnesses or had independent knowledge of the case.

To overturn an indictment because of grand jury bias, the defendant must "make a factual showing of prejudice." *Chief v. State,* 718 P.2d 475, 477 (Alaska App.1986) (quoting *Hohman v. State,* 669 P.d 1316, 1319 (Alaska App.1983)). When a juror who has been exposed to information concerning a case or is acquainted with various trial participants nevertheless professes to be capable of rendering a fair and impartial decision based on the evidence presented, no prejudice is shown. *See Chief,* 718 P.2d at 477. All of the jurors McDonald refers to in alleging grand jury bias either stated that they could be fair and impartial or were excused.[2] Since McDonald failed to sustain his burden of showing prejudice, the superior court correctly rejected his claim of grand jury bias.

### c. Hearsay

McDonald's grand jury heard numerous witnesses testify about statements that various persons connected with the case had made. One group of grand jury witnesses—Henderson's co-workers from the Center, Janet Carter and Suzanne Hinson; her attorney, Matthew Jamin; Jamin's investigator, Albert Ruble; the friend whose car Henderson had borrowed, Debra Sundberg; and Henderson's mother, Catherine Munro—described the statements Henderson made the day she disappeared about her afternoon meeting at the Center with McDonald and her agreement to meet McDonald at the cannery later that night. Other witnesses—including Ibach's friends Marjorie Holden and Lynn Hutcherson—related Ibach's statements about wanting Henderson to "disappear" and wanting to find a "hit man."

McDonald argues that the testimony of these witnesses amounted to inadmissible hearsay and required dismissal of his indict-

**2.** In a related argument, McDonald contends that the grand jury was "tainted" because grand juror Kevin Owen expressed his opinion about the defendants' guilt in the presence of other grand jurors. Owen was excused; the district attorney admonished remaining grand jurors that Owen's statement was not evidence and should be disregarded. McDonald has failed to show prejudice.

McDonald also believes that his indictment should be dismissed because one grand juror did not understand the English language. However, this grand juror was able to converse appropriately with the prosecutor and stated that she would ask questions if she became confused. Again, we find that McDonald has made no showing of prejudice.

ment. These same witnesses testified at trial, where their testimony was admitted over McDonald's objection. In a separate argument, which we address and reject later in this decision, McDonald contends that admission of this testimony at trial also amounted to error. Because we ultimately conclude that the disputed testimony was admissible at trial, we find that its admission before the grand jury was also proper.

■ McDonald raises two hearsay claims in connection with the grand jury that he has not addressed in his argument concerning the admissibility of evidence at trial. First, he claims that Kodiak travel agent Nancy Frost presented inadmissible hearsay when she told the grand jury about Ibach's pre-abduction inquiries into April airline fares to Bangkok and his comment that he would meet two of his friends there. Ibach's inquiries about airline fares are not hearsay, however, for they are not factual assertions. *See Stumpf v. State,* 749 P.2d 880, 891 (Alaska App.1988). Ibach's comment that he planned to meet two friends in Bangkok was admissible as evidence of his planning and preparation for the abduction and to show his interest in leaving Kodiak afterwards. The statements were admissible for these purposes under the state-of-mind exception to the hearsay rule, Alaska Rule of Evidence 803(3).

■ Second, McDonald challenges the grand jury testimony of Kodiak Police Officer William Walton. Walton told the grand jury about items of Henderson's clothing that had washed up on the shoreline of Monashka Bay; he went on to conjecture about where the items must have entered the water, basing his conclusions on information he had received from a Coast Guard expert on tides. McDonald characterizes Walton's testimony as "expert witness hearsay" and insists that it should not have been admitted. However,

McDonald failed to raise this issue before the trial court; he has thus waived it on appeal. Alaska Criminal Rule 12(e); *see Gaona v. State,* 630 P.2d 534, 537 (Alaska App.1981). Moreover, even if it were improper, any error in its admission before the grand jury would be harmless, since the remaining evidence is more than sufficient to support McDonald's indictment. *See Boggess,* 783 P.2d at 1176–77.[3]

### d. Failure to Present Exculpatory Evidence

■ McDonald argues that the prosecution was aware of exculpatory evidence that was not presented to the grand jury. He asserts that the failure to present this evidence called for dismissal of his indictment. Although the prosecution does have a duty to present exculpatory evidence to the grand jury, "only material substantially favorable to the defendant need be presented." *Sheldon v. State,* 796 P.2d 831, 838 (Alaska App.1990) (quoting *Tookak v. State,* 648 P.2d 1018, 1021 (Alaska App.1982)). Exculpatory evidence will not be deemed "substantially favorable," and its production by the prosecution will not be required, unless it is the type of evidence that tends, in and of itself, to negate the defendant's guilt. *York v. State,* 757 P.2d 68, 73 (Alaska App.1988).

Although the evidence McDonald points to may well be exculpatory in the limited sense that it may be the kind of evidence skilled counsel might develop and rely on to argue reasonable doubt to the jury, *see Frink v. State,* 597 P.2d 154, 166 (Alaska 1979), it does not tend to negate McDonald's guilt in its own right. The superior court properly determined that the prosecutor had no duty to present this evidence to the grand jury. *Id.*

---

**3.** In the portion of his brief dealing with grand jury hearsay, McDonald also challenges the testimony of Kodiak Police Officer Barry Paris, although the challenge is not technically based on hearsay. Paris told the grand jury that Kerwin's boots had field-tested positive for the presence of blood. McDonald contends that this testimony was potentially misleading because the field test did not establish that the blood was human (and, indeed, subsequent laboratory testing established that it was not). For this reason, McDonald

asserts that the report of the blood test should have been introduced to the grand jury instead of Paris' testimony concerning the report. However, the grand jury was well aware that Paris' field test had been inconclusive. Paris expressly testified that the test did not distinguish between animal and human blood. One grand juror even commented that the blood on the boot could have been fish blood, since "this is a fishing town, you know." Admission of Paris' testimony was not improper.

#### e. Pressuring Grand Jurors to Indict

■ McDonald contends that the prosecutor "rushed" the grand jury by failing to inform it that Alaska's speedy trial rule, which guarantees defendants the right to be tried within 120 days of arrest, could be extended if the grand jury believed it necessary to obtain FBI test-results that were not yet available. McDonald reasons that the prosecutor's failure to give this information to the grand jury led the grand jury to believe that it was required to vote on indictment immediately, "even though dissatisfied with the scientific evidence."

McDonald's argument, however, builds on isolated portions of the grand jury transcript. Our review of the record convinces us that, when read in their entirety and in context, the statements of the grand jury prosecutor do not support the conclusion that the grand jury was pressured or misled into a hasty vote on the indictments in McDonald's case. The trial court was not clearly erroneous in concluding that the prosecution did not exert undue pressure on the grand jury. *Andreanoff v. State,* 746 P.2d 473, 477 (Alaska App. 1987).

#### f. Grand Jury Instructions

McDonald asserts that he was materially prejudiced because the prosecutor misinstructed the grand jury on the law applicable to his kidnapping charge, on the corpus delicti doctrine, and on the standard of proof governing grand jury proceedings.

McDonald first claims that the prosecutor misinstructed the grand jury as to the element of restraint in the kidnapping charge, *see* AS 11.41.370(3), by telling it that "restraining someone doesn't mean tying them up, it just means limiting their liberty in some way." McDonald insists that the prosecutor should instead have made it clear that, for purposes of kidnapping, an act of restraint must involve substantial interference with liberty. Because McDonald did not raise this argument in the trial court, we decline to consider it. Criminal Rule 12(e); *Gaona v. State,* 630 P.2d 534, 537 (Alaska App.1981).

McDonald next contends that the prosecutor failed to explain the corpus delicti doctrine to the grand jury. McDonald has raised a similar claim in challenging the sufficiency of the evidence presented at trial; as we explain in greater detail when we address that claim, the corpus delicti doctrine is essentially irrelevant in this case because the state did not rely on proof that McDonald had confessed to kidnapping and murdering Henderson.

■ McDonald also challenges the prosecutor's instructions on the standard of proof that applies to grand jury proceedings. McDonald relies on comments made by the prosecutor that the evidence had to be sufficient to "put the person to trial" or "charge him with a crime" before the grand jury should indict. McDonald maintains that this advice conflicts with the standard specified in Alaska Criminal Rule 6(q), which permits the grand jury to indict only "when all of the evidence taken together, if unexplained or uncontradicted, would warrant a conviction[.]"

The purportedly improper instruction, however, was made by the prosecutor in response to a grand juror who asked for clarification of the Rule 6(q) standard after it was read in full to the entire grand jury. While the prosecutor's informal explanation was certainly incomplete, when viewed in the context of the full standard that had just been read, the informal explanation was neither misleading nor inaccurate. *See Sheldon v. State,* 796 P.2d 831, 837 (Alaska App.1990) (charge was sufficient if it left the grand jury "with the understanding that it should not return an indictment unless it was satisfied that the evidence presented, if unexplained or uncontradicted, established a probability of [the defendant's] guilt and would therefore ... justify, holding [the defendant] for trial"); *see also Hohman v. State,* 669 P.2d 1316, 1320 (Alaska App.1983).

#### g. Sufficiency of Grand Jury Evidence

■ McDonald argues that the state failed to prove specific intent for either kidnapping or murder; he claims that there was no evidence that he knew Henderson was going to be kidnapped or murdered or that

he intended to help cause her death. McDonald ignores the significance of the circumstantial evidence, which clearly indicated his participation in a planned abduction and murder. Though largely circumstantial, the totality of the evidence before the grand jury was sufficient to support its finding that "all the evidence taken together, if unexplained or uncontradicted" would have warranted McDonald's convictions. Alaska R.Crim.P. 6(q).

### h. Conclusion on Grand Jury Issues

In summary, we conclude that the trial court did not abuse its discretion in denying McDonald's motion to dismiss the indictment. *Sheldon,* 796 P.2d at 834.

### 2. *Motion to Suppress*
#### a. Procedural Background

The morning after Henderson was abducted, the police obtained and executed a warrant authorizing them to seize and search McDonald's van. One of the articles discovered in the search was the back of a post earring. After the initial search, the van was towed to a gas station to determine how much fuel remained in the tank; it was later towed to a secured impound lot in Kodiak, where it was held as evidence. Approximately six months later, shortly before the first trial, Kodiak Police Detective Barry Paris again searched the van at the impound lot; he noticed the front portion of the previously-discovered earring back enmeshed in wiring between the engine cowling and one of the van's seats. Paris had been given a description of the earrings worn by Henderson on the night of her abduction and recognized the earring as Henderson's. Before seizing the earring, however, Paris applied for and obtained a second warrant.

Prior to trial, McDonald moved to suppress the evidence seized from his van. He argued that the first warrant was issued without probable cause and the second was tainted because it was based on evidence Paris obtained during his second entry into the van, which, according to McDonald, was warrantless and therefore impermissible. The trial court denied this motion, finding that the first warrant was supported by probable cause and ruling that the state did not need a second warrant to reenter the van because the van had remained in police custody. McDonald renews his arguments on appeal.

#### b. First Warrant

McDonald contends that the trial court should have suppressed the evidence seized from the first search of his van because the warrant was not supported by probable cause. Specifically, McDonald argues that the magistrate had no evidence of violence or forcible restraint, or of a motive for McDonald to harm Henderson.

■ Probable cause sufficient to issue a search warrant exists whenever "reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed." *Badoino v. State,* 785 P.2d 39, 41 (Alaska App.1990) (quoting *Harrelson v. State,* 516 P.2d 390, 396 (Alaska 1973)) (citation omitted); *State v. Chapman,* 783 P.2d 771, 772 (Alaska App.1989). A finding of probable cause will be reversed only if an abuse of discretion is shown. *Badoino,* 785 P.2d at 41.

■ Here, the magistrate who issued the initial warrant heard evidence describing Henderson's meeting with McDonald in his van and the events leading up to that meeting. Private investigator Ruble expressly testified that he had suspected a setup and that McDonald matched Henderson's description of the man she was to meet at King Crab Cannery. The magistrate was also informed that Henderson had not been seen or heard from after her disappearance and that efforts to determine her whereabouts had proven futile. Officer Palmer described his interview with McDonald, stating that McDonald admitted that he had met Henderson the previous evening and that she had been inside his van.

Given the totality of the evidence, the magistrate who issued the warrant could reasonably have concluded that Henderson had probably been kidnapped and that evidence of the kidnapping could likely be found in McDonald's van. The superior court did not

abuse its discretion in finding the first warrant to be supported by probable cause.

### c. Second Search

■ McDonald challenges the validity of the second search warrant, which resulted in the seizure of Henderson's earring, arguing that the search was tainted by Paris' warrantless entry into McDonald's van. McDonald contends that the first warrant was no longer valid when Paris entered the van shortly before trial; accordingly, in McDonald's view, the trial court erred in finding that a second warrant was unnecessary.

It is settled, however, that

[a]n object lawfully seized as evidence may be kept in custody pending trial, and during that period "it is plainly within the realm of police investigation to subject [such an object] to scientific testing and examination" when such is done "for the purpose of determining its evidentiary value." That is, if the initial seizure was upon probable cause that the item would be of evidentiary value, it may be tested and examined for the purpose [of] maximizing its value in this respect.

3 Wayne R. LaFave, *Search & Seizure* § 7.5(c) (1987) (footnotes omitted) (quoting *People v. Teale,* 70 Cal.2d 497, 75 Cal.Rptr. 172, 450 P.2d 564 (1969)).

Here, under the authority of the first warrant, McDonald's van had been seized and held as evidence. McDonald nevertheless contends that the van did not remain in police custody. He points out that it was moved twice—once when it was towed to the gas station to test the fuel in its tank and once again when it was towed from the police garage to the impound lot—and thus left police custody before Paris entered and searched it again without a warrant. Although McDonald is correct in noting that the van was moved, he is mistaken in asserting that the movement resulted in a loss of police custody. The record establishes that, from the time of its initial seizure, the van remained in continuous police custody as evidence in McDonald's case.

McDonald had no reasonable expectation of privacy as to the van or its contents while the van was being held as evidence by the police. *Griffith v. State,* 578 P.2d 578, 580 (Alaska 1978) ("no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated") (quoting *United States v. Grill,* 484 F.2d 990, 991 (5th Cir. 1973)). For this reason, Paris' warrantless reexamination of the van and its contents was permissible. Accordingly, the superior court did not err in concluding that Paris could have seized the earring during his warrantless search, without obtaining the second warrant. The validity of the second warrant is therefore a moot issue.

### 3. *Hearsay at Trial*

At trial, the state offered, through the testimony of various witnesses, statements made by Henderson and Ibach. McDonald unsuccessfully objected to the testimony on hearsay grounds and on the ground that these statements violated his constitutional right of confrontation. McDonald also raised a hearsay objection to the admission of Kerwin's notebook, which contained a partial notation of Ibach's telephone number. McDonald renews these arguments on appeal.

### a. Henderson's Hearsay

Over McDonald's hearsay and confrontation clause objections, various associates of Henderson—Janet Carter, Suzanne Hinson, Cathy Wilson, Matthew Jamin, Albert Ruble, and Catherine Munro—testified about statements Henderson had made in the time between her afternoon meeting with McDonald at the Women's Center and her meeting with McDonald at the cannery later that night.

The trial court admitted the evidence pursuant to Alaska Rule of Evidence 803(3), instructing the jury that Henderson's statements were admissible to show her plans for the evening of her disappearance.

■ Alaska Rule of Evidence 803(3) carves out an exception to the hearsay rule when a statement is not offered to prove the truth of the matter asserted but is offered to prove the declarant's state of mind. Henderson's statements were properly ad-

mitted under this exception to prove that she intended to meet McDonald at the King Crab Cannery that evening.

■ The confrontation clause does not require an independent showing of reliability other than that necessary to satisfy the requirements of a firmly rooted hearsay exception:

> Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Charles v. State,* 780 P.2d 377, 382 (Alaska App.1989). Because the state-of-mind exception to the hearsay rule is traditionally accepted and firmly rooted, admission under this exception did not violate McDonald's right to confrontation. *See Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892); *Barber v. Scully,* 731 F.2d 1073, 1075 (2d Cir.1984).

McDonald correctly observes that, since A.R.E. 803(3) would extend only to evidence offered to prove Henderson's state of mind, this exception would not justify the admission of Henderson's statements to prove the substantive truth of "facts [Henderson] remembered or believed." In other words, the state-of-mind exception would not permit the use of Henderson's statements to prove what McDonald told Henderson during their afternoon encounter at the Center or that McDonald—as distinct from Henderson—planned to be at the cannery. Likewise, while Henderson's statements could be admitted under this exception to show that she believed she would receive information relating to her custody dispute with Ibach when she met McDonald at the cannery, the exception would not allow admission to prove that McDonald had actually promised to give her

such information or that she would indeed receive it.

It does not appear, however, that Henderson's statements were admitted for these purposes. Particularly with respect to Henderson's statements that she would receive information implicating Ibach, it is apparent that this evidence was not offered to prove that Henderson actually received this information. The state's theory was just the opposite: the state wanted to prove that McDonald had never planned to give such material to her, but only promised it as a ruse to lead her into a trap.

■ Moreover, to the extent that Henderson's statements might have been used to prove the truth of substantive facts Henderson said she remembered—in other words, what McDonald had told her—her statements were independently admissible as excited utterances pursuant to A.R.E. 803(2), which creates a hearsay exception for any statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." As the trial court correctly recognized, this provision applies to Henderson's statements.

Henderson's statements about what McDonald had told her related to a startling event: McDonald's unexpected appearance at the Center with the news that he would turn over information to help Henderson obtain full custody of her children. The witnesses who related Henderson's out-of-court statements uniformly testified that Henderson was "very excited," "ecstatic," and in an "extremely high" emotional state after meeting McDonald. Although some question might be raised as to Henderson's statements to Jamin, Ruble, and Munro, which occurred approximately an hour after her meeting with McDonald at the Center, the statements Henderson made to her co-workers immediately after the meeting plainly fell within the excited utterance exception.[4]

---

4. Even as to Henderson's later statements to Jamin, Ruble, and Munro, however, the testimony below indicated that her excitement continued unabated. The Commentary to A.R.E. 803(2) would support application of the excited utterance exception under these circumstances, despite the passage of a significant amount of time.

In relevant part, the Commentary states that "the standard of measurement is the duration of the state of excitement ... the character of the transaction or event will largely determine the significance of the time factor." If Henderson's later statements to Jamin, Ruble, and Munro did not fall within the excited utterance exception, any

McDonald's claim that his right to confront and cross-examine Henderson was violated fails under A.R.E. 803(2) as well. The excited utterance exception is a firmly rooted hearsay exception and statements admitted under this exception do not violate the confrontation clause. *Brandon v. State*, 839 P.2d 400, 407 (Alaska App.1992).

▪ Finally, we note that if any error occurred in admitting the disputed evidence for the purpose of establishing that McDonald did in fact meet with Henderson on the night of her abduction, that error would plainly be *de minimis*. McDonald expressly admitted meeting Henderson at the cannery; he did not dispute this admission at trial; and abundant independent testimony corroborated McDonald's presence. *See Benefield v. State*, 559 P.2d 91, 96 (Alaska 1977) (holding that error in admitting codefendant's statements was harmless; defendant's own admissions and other admissible witness testimony established identical proposition).

### b. Ibach's Hearsay Statements

At trial, over McDonald's objections, Lynn Hutcherson, Marjorie Holden, and John Kostal were allowed to testify about statements Ibach had made to them, both before and after Henderson's disappearance. Although McDonald acknowledged that the statements might be admissible against Ibach, who was also on trial, McDonald claimed that the statements were inadmissible hearsay as to himself and that their admission against Ibach would violate his right to confrontation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

*Bruton* involved a joint trial of defendant Bruton and his codefendant. Although the codefendant did not testify, the trial court admitted the codefendant's confession, which expressly implicated Bruton. The jury was instructed to consider the confession only as to the codefendant and to disregard it in determining Bruton's guilt. The Supreme Court found a violation of Bruton's right to confront and cross-examine the codefendant, concluding that no jury could have heeded a limiting instruction to disregard such "powerfully incriminating" evidence of Bruton's guilt. *Id.* at 135–37, 88 S.Ct. at 1627–29.

### (i) Hutcherson's Testimony

At McDonald's trials, Lynn Hutcherson, an acquaintance of Ibach, testified that Ibach told him that Ibach felt "it would be easier for the custody fight and everything if [Henderson] just wasn't around, if she just didn't show up some day or just disappeared." Ibach also told Hutcherson not to "be surprised if [Henderson] just turns up missing some day." Hutcherson testified that Ibach asked him if he had ever used a "hit man" or knew anybody who might know how to contact one. Hutcherson also testified that a few days after Henderson disappeared, Ibach called him and told him not to tell the police about their earlier conversations because those conversations were confidential and "between us buddies."

On appeal, McDonald contends that Hutcherson's testimony was admissible only against Ibach and that its admission against McDonald violated the *Bruton* rule.

▪ The *Bruton* rule, however, applies only when a codefendant's out-of-court statement is admissible against the codefendant solely as an admission of a party-opponent, *see* A.R.E. 801(d)(2), and is inadmissible hearsay as to the defendant. *Bruton* has no application when a codefendant's statements do not amount to hearsay, or when they are independently admissible against the defendant under a recognized hearsay exception.[5]

---

error in their admission would clearly be harmless beyond a reasonable doubt, given the admissibility of the initial excited statements Henderson made to her co-workers at the Center. *Benefield v. State*, 559 P.2d 91, 96 (Alaska 1977).

5. Alaska Rule of Evidence 801(d)(2) does not create an exception to the hearsay rule for admissions and confessions; instead, it defines

such declarations by a party-opponent as nonhearsay when the opposing party seeks to use the admission or confession against the declarant. As to any other person, the statement is hearsay and is inadmissible unless there is some other basis for finding it to be nonhearsay or unless an exception to the hearsay rule independently applies.

■ Here, a number of the statements Hutcherson attributed to Ibach were not hearsay. Under A.R.E. 801(c), out-of-court statements will amount to hearsay only when "offered in evidence to prove the truth of the matter asserted." Hutcherson's testimony about Ibach's comment that his custody battle would be simpler if Henderson disappeared was not offered to prove the truth of the matter asserted—that his custody battle would indeed be simpler. Similarly, Ibach's request that Hutcherson not tell the police about his earlier comments is not a factual assertion and is also not hearsay. *Stumpf v. State,* 749 P.2d 880, 891 (Alaska App.1988). Admission of out-of-court statements that were not hearsay did not violate McDonald's right to confront the witnesses against him. *Brandon v. State,* 839 P.2d 400, 408 (Alaska App.1992).

■ McDonald is correct that Ibach's statements to Hutcherson not to "be surprised if [Henderson] just disappears," and Ibach's questions about whether Hutcherson knew of a contract killer may qualify as hearsay, in that they may be construed as including implied assertions of Ibach's desire to kill Henderson. As such, however, these statements reflected Ibach's then-existing state of mind. They were admissible under Alaska Rule of Evidence 803(3) and were highly relevant, as to both Ibach and McDonald, to establish motive. Since the statements could be admitted independently of their status as admissions of a party-opponent, their use was not restricted to Ibach, and no *Bruton* danger arose.

McDonald contends, however, that admission of hearsay, even if pursuant to a firmly rooted exception, violates his right to confront the witnesses against him. He reasons that, under *Hawley v. State,* 614 P.2d 1349, 1358 (Alaska 1980), even a statement admissible under a firmly rooted exception will violate the confrontation clause unless the court independently finds that the statement is "sufficiently reliable" to justify its admission. McDonald misreads *Hawley,* which holds only "that evidence admissible under the joint undertaking exception to the hearsay rule does not automatically satisfy the requirements of the confrontation clause. To

satisfy the right to confrontation, a statement must have sufficient indicia of reliability." *Id.* at 1358. *Hawley* thus speaks only in the context of the coconspirator exception to the hearsay rule and does not apply to other hearsay exceptions.

As we have previously indicated, the state-of-mind exception to the hearsay rule is a firmly rooted exception; a statement admitted pursuant to such an exception does not violate the confrontation clause.

### (ii) Holden's Testimony

At both McDonald's trials, Marjorie Holden testified that Ibach told her that he felt like killing Henderson, that he had spoken to someone "about having [Henderson] taken care of," and that Henderson would "disappear." Holden also testified that on several occasions Ibach discussed numerous scenarios for Henderson's disappearance. However, because Kerwin was a codefendant with McDonald and Ibach during the first trial, the trial court precluded Holden from testifying about Ibach's description of the person he had consulted regarding having Henderson "taken care of." The description fit Kerwin, and the trial court evidently feared that its admission at the first trial might create a *Bruton* problem as to him.

At the second trial, however, the same problem did not arise, since Kerwin had been acquitted at the first trial. The trial court allowed Holden to testify about Ibach's description of the contract killer: "an older man, someone with a serious health problem. He had a serious drinking problem, the man had a teenage son at the [Baptist] Mission." Kerwin was called as a witness at the second trial; the jury was made aware that the description fit him.

■ McDonald contends, as he did below, that Ibach's statements to Holden were hearsay and that their admission violated his right to confrontation. As was the case with Hutcherson's testimony, however, Holden's testimony about Ibach's declaration of his desire to see his ex-wife disappear and his discussion about methods for achieving this goal reflected Ibach's state of mind and were admissible against both Ibach and McDonald

under Alaska Rule of Evidence 803(3). As discussed above, admission of state-of-mind evidence did not violate McDonald's confrontation rights. *See Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892); *Barber v. Scully,* 731 F.2d 1073, 1075 (2d Cir.1984).

■ Ibach's announcement that he had spoken to someone about making Henderson disappear and his description of the contract killer were admissible against Ibach under A.R.E. 801(d)(2)(A) as admissions by a party-opponent, but not against McDonald.[6] In admitting these statements, the trial court expressly advised the jury that Holden's testimony was admissible only against Ibach and should be disregarded in the consideration of McDonald's guilt.

McDonald nevertheless argues that the trial court's limiting instruction was insufficient to protect him. He asks this court to adopt, as a matter of state constitutional law, the reasoning of the dissent in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

In *Richardson v. Marsh,* Marsh and a codefendant had been charged with murder, robbery and assault. At trial, the codefendant's confession was admitted over Marsh's objection. *Id.* at 203, 107 S.Ct. at 1705. The confession described a conversation between the codefendant and another accomplice while driving to the victims' home, during which the accomplice said he would kill the victims after robbing them. *Id.* at 203 n. 1, 107 S.Ct. at 1705 n. 1. Although Marsh was in the car at the time of the conversation, the trial court redacted the codefendant's confession to omit all reference to Marsh and her presence in the vehicle. *Id.* The trial court instructed the jury not to use the confession against Marsh in any way. *Id.* at 204, 107 S.Ct. at 1705.

Marsh nevertheless argued that the codefendant's confession was inferentially incriminating and thus violated the *Bruton* rule. The crucial issue at trial was whether Marsh

had been aware of the accomplice's intent to kill the victims. Marsh's presence in the car was established by her testimony at trial and was undisputed. Marsh argued that the evidence of her presence, taken in conjunction with the codefendant's confession, made it clear that Marsh knew of the accomplice's intent. Marsh contended that, under such circumstances, just as in *Bruton,* no jury could reasonably be expected to disregard the powerfully incriminating significance of the confession in establishing Marsh's guilt.

The majority of the Supreme Court found Marsh's argument unpersuasive, holding that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. at 1709. The Court noted:

> In *Bruton,* the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).
>
> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.

*Id.* at 208, 107 S.Ct. at 1707–08 (citations omitted) (footnote omitted).

The *Marsh* dissent disagreed with the majority's categorical restriction of the *Bruton* rule, reasoning that a basic premise of the rule was that "certain kinds of hearsay 'are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give.' " *Id.* at 212,

---

6. The state argues that these statements were admissible under the coconspirator exception to the hearsay rule because a conspiracy existed between McDonald and Ibach. However, this argument was never squarely raised before the

trial court and does not appear to have been the basis for admission by the court. Under the circumstances, there is no reason to address the coconspirator exception.

107 S.Ct. at 1710. The dissent argued that "*Bruton* has always required trial judges to answer the question whether a particular confession is or is not 'powerfully incriminating' on a case-by-case basis; they should follow the same analysis whether or not the defendant is actually named by his or her codefendant." *Id.* at 214, 107 S.Ct. at 1711.

Relying on the *Marsh* dissent, McDonald urges us to find that Ibach's hearsay description of a contract killer who resembled Kerwin, when viewed in conjunction with Kerwin's testimony at the second trial that he and McDonald were together most of the day of Henderson's abduction, "unfairly" associated McDonald with Ibach and thus deprived him of a fair trial.

We need not determine if the majority or dissenting views in *Marsh* would apply as a matter of Alaska constitutional law, for we find McDonald's confrontation clause argument unpersuasive under either view. Under the majority's holding in *Marsh*, Ibach's statement, accompanied as it was by a limiting instruction, was properly admitted, since it did not explicitly refer to McDonald, or, for that matter, to Kerwin. McDonald concedes the point. A like result follows under the approach espoused by the *Marsh* dissenters, who call for a case-by-case analysis to determine whether the inferential significance of the codefendant's out-of-court statement is so "powerfully incriminating" that "jurors cannot be trusted to give such evidence the minimal weight it logically deserves."

Under this approach, Ibach's statement might arguably be deemed "powerfully incriminating" as to Kerwin, who fit the description of the contract killer. Given the jury's exposure to Kerwin when he testified at the second trial, it could easily have inferred that Kerwin was the person with whom Ibach had spoken about killing Henderson. Even as to Kerwin, however, it is an open question whether the direct inference arising from physical similarity would qualify as the type of "powerfully incrimina-

ting" evidence that could be equated with a confession expressly naming Kerwin as a perpetrator; for even given Kerwin's similarity to the killer described by Ibach, the link suggested by Ibach's statement remained speculative at best, and Ibach's statement itself was equivocal as to whether any definite arrangements had been made with the person whom he had contacted.

When viewed with regard to McDonald, rather than Kerwin, the incriminatory potential of Ibach's statement is attenuated indeed. In themselves, neither Ibach's statement nor the inference arising from Kerwin's resemblance to the person whom Ibach described created any link, direct or indirect, to McDonald. To find incriminatory potential as to McDonald, the jury would have been required to draw a second-tier inference based on Kerwin's testimony that he and McDonald had been together on the day of the abduction.

Yet the connection established by McDonald's mere physical presence in Kerwin's company is hardly the type of "powerfully incriminating" link to Ibach that a jury would have been hard pressed to disregard. To the contrary, jurors are regularly given, and are routinely presumed to follow, instructions commanding that no inference of guilt should be drawn from evidence showing the defendant's mere acquaintance or association with others. When such instructions are used, we reasonably expect the jury to base its determination of guilt on evidence showing something more than mere association.

Precisely the same situation exists here. The jury was told to disregard Ibach's statements to the extent that those statements suggested McDonald's guilt. Insofar as the evidence merely established that McDonald associated with Kerwin, Ibach's statements were potentially incriminating only in a way that could readily be disregarded by a properly instructed jury.[7] As in similar situations involving problems of guilt by associa-

---

7. This is particularly true because other, independent evidence established a direct link between McDonald and Ibach in this case: the gun Ibach retrieved from Kostal a few weeks before Henderson disappeared was the same gun McDonald had given to Baldwin after he was ques- tioned by the police, Ibach and McDonald had been seen together before Henderson disappeared, and McDonald admitted that he knew Ibach when Officer Palmer questioned him the morning after Henderson had disappeared.

tion, there is no cause here to believe that the court's instruction to disregard the weak and attenuated link between McDonald and Ibach could not be heeded or that the jury could not be counted on to search elsewhere for independent, "powerfully incriminating" evidence before finding McDonald guilty. Here, such evidence existed in abundance. In the face of the independent evidence of McDonald's guilt, there is no basis for concluding that Ibach's hearsay statements influenced the jury's verdict in any manner.

Our conclusion that admission of Ibach's statements would not be violative of McDonald's right of confrontation even under the analysis adopted by the dissent in *Marsh* finds strong additional support in pre-*Marsh* cases decided by the Alaska Supreme Court, which have consistently declined to find hearsay statements similar to Ibach's "powerfully incriminating" for purposes of applying *Bruton. See Hawley v. State*, 614 P.2d 1349, 1357 (Alaska 1980); *Benefield v. State*, 559 P.2d 91, 95–96 (Alaska 1977); *Whitton v. State*, 479 P.2d 302, 314–15 (Alaska 1970). The trial court did not abuse its discretion in admitting Holden's testimony concerning Ibach's statements.

### (iii) Kostal's Testimony

■ McDonald advances additional hearsay and confrontation clause arguments as to the testimony of John Kostal, a friend of Ibach who testified only at the second trial. Kostal stated that approximately four weeks before Henderson disappeared, Ibach gave him a stainless steel .357–caliber revolver. Two or three weeks later, Ibach asked for the gun back, claiming that he thought it might have been stolen. Kostal returned the gun to Ibach. At trial, Kostal identified the gun that McDonald gave Baldwin the night Henderson disappeared as the same gun that Ibach had given him and taken back before Henderson's disappearance. Kostal testified that, after Henderson's disappearance, Ibach told him that the gun was unrelated to Henderson's disappearance and asked him to be quiet about it.

McDonald claims that Kostal's testimony about Ibach's statements is inadmissible hearsay and that its admission violated his right to confrontation. Ibach's statements to Kostal are not hearsay, however, for, as we have already indicated, hearsay is "a statement … offered in evidence to prove the truth of the matter asserted." A.R.E. 801(c). Ibach's statement that the gun was unrelated to Henderson's disappearance was not offered to prove that the gun was, in fact, unrelated to Henderson's kidnapping or murder. *See Walker v. State*, 652 P.2d 88, 93 (Alaska 1982). Moreover, Ibach's request to keep quiet about the gun was not a statement asserting any historical fact. Because it was offered, not to prove any factual assertion therein, but instead to show consciousness of guilt on Ibach's part, the statement was not hearsay. *See Stumpf v. State*, 749 P.2d 880, 898 (Alaska App.1988). And because none of Kostal's testimony is objectionable on hearsay grounds, there is no confrontation violation. *Id.* at 894 (holding that "[a]n out-of-court statement admitted for a nonhearsay purpose does not violate an accused's right to confront the prosecution's witnesses").

The trial court properly admitted Kostal's testimony.

### c. Kerwin's Notebook

■■ McDonald's last hearsay claim pertains to James Kerwin. After Kerwin's arrest, police found a notebook among his possessions. The notebook contained a partial telephone number that appeared to be Ibach's. This portion of the notebook was admitted at trial, over McDonald's objection, to bolster the connection between Ibach and Kerwin. On appeal, McDonald argues that the notebook should have been excluded as hearsay. The claim is meritless, since the notebook was not offered to prove the truth of any factual assertion contained therein and hence was not hearsay. A.R.E. 801(c). Because the notebook was not hearsay, its admission did not violate McDonald's right to confrontation. *Stumpf*, 749 P.2d at 894.

### 4. *Admissibility of Physical Evidence*

#### a. Photographs

■ McDonald challenges as unfairly prejudicial the admission of photographs

from the camera found in McDonald's van, which depicted the excursion Gladys Baldwin and her son, Michael, took with McDonald and Kerwin to a cabin overlooking Monashka Bay. McDonald particularly objects to a photograph of himself and Kerwin "horsing around near the edge of a cliff with Michael, holding him by the arms and legs," contending that it is unduly suggestive. McDonald argues that Baldwin could have testified to establish McDonald and Kerwin's familiarity with the area.

A trial judge has broad discretion to admit or exclude photographs. The judge's decision must be affirmed on appeal unless the judge abuses that discretion. *Valentine v. State*, 617 P.2d 751, 754 (Alaska 1980); *Pena v. State*, 664 P.2d 169, 177 n. 7 (Alaska App.1983), *rev'd on other grounds*, 684 P.2d 864 (Alaska 1984). The disputed photographs were relevant to establish McDonald's awareness of the cabin site, his familiarity with the location, and as evidence of his preparation and planning. We conclude that the trial court did not abuse its discretion in admitting the photographs.

### b. Guns and Knives

At McDonald's first trial, Kodiak Police Officer William Rhodes testified that during his search of McDonald's van he found a .30–caliber rifle and a loaded .32–caliber pistol. Kodiak Police Officer William Walton testified that McDonald had three knives in his possession when he was arrested. However, only the pistol and one of the knives were admitted into evidence. At the second trial, the rifle was apparently not mentioned and

no knives were admitted. The .32–caliber pistol, however, was again admitted. Also admitted was the .357 caliber revolver that McDonald had given to Baldwin, which Kostal identified as being the same gun Ibach had given him before Henderson's abduction. (The revolver was excluded at the first trial.)

McDonald argues that the trial court abused its discretion in admitting these weapons, arguing that they are irrelevant because there is no evidence to establish their use in the commission of the alleged crimes.

■ To be relevant, evidence need only have "a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A.R.E. 401.

[T]he test of relevance has never required that the evidence offered be conclusive of the point [ ] sought to be established. All that is required for evidence to be relevant is that it render the proposition for which it is offered more probable than it would otherwise have been. "Any more stringent requirement is unworkable and unrealistic."

*Denison v. Anchorage*, 630 P.2d 1001, 1003 (Alaska App.1981) (quoting Commentary to A.R.E. 401).

■ In the present case, the .357–caliber revolver was relevant to establish a connection between McDonald and Ibach and to show consciousness of guilt on McDonald's part. The trial court did not abuse its discretion in admitting it for these purposes.[8]

8. McDonald filed pretrial motions to sever his trial from those of Ibach and Kerwin. The primary basis for these motions was his claim that he would be prejudiced at a joint trial by the admission of evidence against Ibach that would be inadmissible against himself. The inadmissible evidence that was the subject of McDonald's severance motions consisted of the various hearsay statements we have addressed in the text of this decision, as well as the .357–caliber revolver that originated with Ibach and was later given by McDonald to Baldwin. The trial court declined to sever the cases and McDonald now argues that denial of severance amounted to error. Our conclusion that the revolver and the various hearsay statements were admissible at trial dis-

poses of McDonald's primary basis for requesting severance.

McDonald has also advanced severance arguments on appeal that he did not raise below. He contends that severance was justified at the first trial to avoid prejudice to him stemming from the preclusion of testimony concerning Ibach's description of the contract killer. McDonald's theory is that the reference to a contract killer who resembled Kerwin would have been favorable to him because it would have established that he was not the contract killer Ibach had spoken with. The record establishes, however, not only that McDonald failed to request severance on this theory, but also that Ibach's apparent description of Kerwin was excluded at trial

*Bangs v. State,* 663 P.2d 981, 984 (Alaska App.1983) (holding that the probative nature of a weapon was supported when "shortly after the [crime], [the defendant] gave the pistol to a friend, who buried it").

■■■ The remaining weapons were admitted to show that McDonald had the means at hand to kidnap Henderson, that is, to restrain her by threat of violence or force. Again, the evidence was properly admitted for this purpose. Although McDonald suggests that the jury might have believed that these were the murder weapons, our review of the record indicates that the jury was made aware of the proper relevance of the weapons and could not reasonably have concluded that the state was advocating that they were the murder weapons.

We find no error.

### 5. *Henderson's Drug Use*

Prior to the first trial, the prosecution moved for a protective order against admission of any evidence of Henderson's alleged use of controlled substances. The superior court did not rule on the issue, but asked instead if the defense intended to pursue the issue. Only Ibach's lawyer responded, saying that "it is certainly possible." The trial court replied, "before you get into it, I want to know about it and I want to know about it out of the jury's presence ... so that we can ... find out where we're going, but I'm not going to say at this moment that it's neces-

sarily inadmissible." The issue did not arise again before or during the first trial.

Prior to the second trial, the state renewed its request for a protective order; the court informed the parties that the protective order would "be granted unless you make some application that I don't understand at this time." No one ever mentioned the issue again.

■■■ McDonald now argues that the protective order prevented him from presenting evidence that would have indicated that he met with Henderson to discuss a drug transaction. As demonstrated by the portions of the transcript quoted above, however, the trial court did not preclude the defense from presenting evidence of Henderson's drug use. Instead, it ruled only that the defense would be required to show the admissibility of any proposed inquiry into the area before raising the issue in the presence of the jury. In any event, McDonald's failure to make a proper offer of proof as to this evidence at trial precludes his belated effort to argue that it was erroneously excluded. A.R.E. 102(a)(2); *Patterson v. State,* 689 P.2d 146, 150 (Alaska App.1984) (holding that defendant's failure to offer proof resulted in his inability to "realistically claim error on appeal"); *Hohman v. State,* 669 P.2d 1316, 1325 (Alaska App.1983).

■■■ McDonald raises a similar, but more specific, claim with respect to the cross-examination of Ruble—Jamin's investigator.

on McDonald's own motion. Because McDonald was instrumental in the suppression of this evidence at trial, he can hardly claim, at this juncture, that severance was necessary to allow its admission.

McDonald's second newly-raised severance argument pertains to the redaction, at the second trial, of the statement he made to Officer Palmer on the night of Henderson's abduction. During his interview with Palmer, McDonald denied knowing Henderson; then, when asked if he knew Laura Ibach, he responded, "I know Jack, is that his wife?" After being told that Henderson was Ibach's ex-wife, McDonald initially persisted in the claim that he did not know Henderson. When Palmer eventually confronted him with information that he and Henderson had been seen together, however, McDonald admitted being with her. In order to protect Ibach from possible prejudice, the trial court precluded Palmer from mentioning McDonald's reference to knowing Ibach. Palmer testified only that

McDonald initially denied knowing Henderson and then conceded that he did know her after he was told they had been seen together. McDonald now claims that the trial court "seriously altered the meaning" of his statements to Palmer when it redacted his statement to eliminate his apparent confusion as to whether Laura Henderson was Ibach's wife. As we have already indicated, McDonald did not raise this argument in requesting severance below. More significantly, McDonald has failed to suggest how the disputed redaction could conceivably have prejudiced him. The obvious prejudice inherent in McDonald's statement to Palmer lay in the fact that he admitted being with Henderson after having initially denied knowing her at all. Full disclosure of the omitted information could have done nothing to mitigate the damaging nature of McDonald's admissions to Palmer. In short, since McDonald has failed to show prejudice that could have justified severance, we do not find plain error.

On direct examination, Ruble was asked if he had heard Palmer's interview with McDonald on the night of Henderson's disappearance. Ruble stated that he had heard the interview; Ruble testified that McDonald acknowledged meeting Henderson on the night of her disappearance. On cross-examination, McDonald's counsel sought to ask Ruble if he had heard McDonald tell Palmer that he (McDonald) and Henderson had met to conduct a drug transaction. McDonald argued that the rule of completeness, A.R.E. 106, required the admission of this evidence so that the jury would not be left with the misimpression that McDonald had admitted culpability for Henderson's disappearance.

The trial court found the rule of completeness inapplicable and excluded the evidence as inadmissible hearsay. McDonald contends that the trial court erred in ruling that A.R.E. 106 did not require the admission of this evidence. Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Ruble's testimony on direct examination did not suggest that McDonald had admitted abducting Henderson or otherwise mislead the jury as to the nature or context of McDonald's statement to Palmer; the statement, as related by Ruble, needed no clarification. Accordingly, A.R.E. 106 did not justify admission of the disputed evidence:

> The limited purpose of A.R.E. 106 is to allow a party to admit omitted portions of a partially admitted statement only when and only to the extent that the omitted portions are necessary to provide context to the admitted portions, or to explain or clarify them. The rule does not make admissible statements that would otherwise be inadmissible; it is meant only to allow contemporaneous admission of evidence that would ordinarily not be admissible until later stages of the trial.

*D'Antorio v. State*, 837 P.2d 727, 736 n. 3 (Alaska App.1992) (quoting *Stoneking v.*

*State*, 800 P.2d 949, 951–52 (Alaska App. 1990) (citations omitted)).

 Moreover, the trial court did not err in finding that the proposed line of inquiry called for hearsay. The trial court could properly conclude that the rather transparent purpose for offering evidence of McDonald's statement that he met Henderson for a drug deal was to prove the truth of the fact asserted therein: that this had in fact been McDonald's purpose for meeting Henderson. The evidence is inadmissible for this purpose. *Stumpf v. State*, 749 P.2d 880, 899 (Alaska App.1988).

### 6. *Evidence of Kerwin's Acquittal*

 Kerwin testified as a prosecution witness at the second trial, after having been acquitted at the first. On direct examination, the prosecutor asked Kerwin if he had seen witness statements and police reports about the case. Kerwin replied that he had. Before cross-examining Kerwin, McDonald requested permission to establish the reason for Kerwin's familiarity with the reports and witness statements, arguing that the prosecutor had left the jury with the impression that, as McDonald's friend, Kerwin had improperly received access to the reports through McDonald and had tailored his testimony to conform to them.

McDonald specifically asked to be allowed to establish a reasonable alternative explanation for Kerwin's knowledge: that Kerwin had been charged and thus had access to the police reports and witness statements. McDonald also requested that the jury be instructed that there were no charges currently pending against Kerwin and that the jury should "not infer anything from the fact that there were charges against him."

The trial court agreed, but only after warning McDonald that "it's a very dangerous inference that you want to raise frankly by going into the trial."

On cross-examination, McDonald elicited that Kerwin had been charged and that his knowledge of the reports resulted from his "own personal experience." The trial court instructed the jury that "[t]he outcome of any charges against Mr. Kerwin is really

irrelevant to any of your responsibilities in this case … you won't speculate upon that or concern yourself with it or discuss it in any way, now or during your deliberations." McDonald also elicited that Kerwin had been offered complete immunity from any prosecution except perjury. Kerwin stated that he had rejected the offer and that, afterward, the state had withdrawn it.

On appeal, McDonald claims that this testimony left the jury with an "improper impression that Kerwin's charges had not been resolved" and a misleading impression of Kerwin's guilt. McDonald claims the testimony was especially prejudicial to him because the prosecutor told the jury that Kerwin was involved in Henderson's death and linked McDonald to the crime because of his friendship with Kerwin. McDonald concludes that the court should either have precluded inquiry concerning Kerwin's charges or should have allowed the jury to hear that Kerwin had been acquitted.

We find no merit to this argument. The inquiry into Kerwin's charges was admitted at McDonald's express request: to meet his concern that the jury might have thought that Kerwin tailored his testimony to benefit McDonald. The court allowed McDonald to develop the issue only after it warned him of its inherent danger. McDonald thereafter made a tactical decision to elicit the fact that Kerwin had been charged. McDonald never requested the alternative relief he now asserts should have been offered: to disclose that Kerwin had been acquitted. At McDonald's request, the trial court told the jury not to speculate on the disposition of the charges against Kerwin.

Any error that occurred in connection with this issue was plainly invited; we decline to consider McDonald's argument. *Barrett v. State,* 772 P.2d 559, 568 n. 10 (Alaska App. 1989). The trial court did not err in excluding evidence of Kerwin's acquittal.

### 7. *Judgment of Acquittal*

#### a. Sufficiency of Kidnapping Evidence

McDonald argues that there was no evidence from which the jury could find the existence of the element of "restraint" required for kidnapping.[9] He claims that the evidence indicated that Henderson's contact with him was voluntary. Alaska Statute 11.-41.300 provides, in relevant part:

> **Kidnapping.** (a) A person commits the crime of kidnapping if
>
> (1) the person restrains another with intent to
>
> . . . .
>
> (C) inflict physical injury upon or sexually assault the restrained person or place the restrained person or a third person in apprehension that any person will be subjected to serious physical injury or sexual assault;
>
> . . . .
>
> (E) facilitate the commission of a felony or flight after commission of a felony[.]

The word "restrain" is defined as meaning:

> to restrict a person's movements unlawfully and without consent, so as to interfere substantially with the person's liberty by moving the person from one place to another or by confining the person either in the place where the restriction commences or in a place to which the person has been moved; a restraint is "without consent" if it is accomplished
>
> . . . .
>
> (B) by force, threat, or deception.

AS 11.41.370(3)(B).

In determining the sufficiency of the evidence to support a conviction, this court evaluates the evidence and the inferences therefrom in the light most favorable to the state. *Bush v. State,* 397 P.2d 616, 618 (Alaska 1964); *Alam v. State,* 776 P.2d 345, 347 (Alaska App.1989). The evidence is sufficient if it supports "a conclusion by a reasonable mind that there was no reasonable doubt about the defendant's guilt." *Alam,* 776 P.2d at 347; *Ratliff v. State,* 798 P.2d 1288, 1290 (Alaska App.1990).

The evidence, viewed in the light most favorable to the state, permits the conclusion that McDonald restrained Henderson

---

**9.** McDonald also argues that the kidnapping conviction merged with his murder conviction. This is a separate issue; we address it in connection with the state's petition for review.

through force, threat and deception. Even viewing the evidence favorably to McDonald—ignoring any inferences arising from the rather vast body of circumstantial evidence bearing on the events that occurred after Henderson entered McDonald's van— and even accepting McDonald's argument that Henderson "voluntarily" met him at the cannery and entered his van, the jury could readily have concluded that McDonald had secured Henderson's presence in the van through deception—by luring her with false promises of information concerning the child custody dispute—thereby committing an act of restraint. AS 11.41.370(3)(B). The trial court did not err in finding sufficient evidence of restraint.

### b. Sufficiency of Murder Evidence

McDonald claims that his conviction of murder violated the corpus delicti rule because the state presented no evidence to prove the fact of Henderson's death or that her death, if it occurred, was caused by criminal agency. McDonald misunderstands the corpus delicti rule. His argument suggests that the rule applies whenever the state seeks to prove murder through circumstantial evidence.

In fact, the corpus delicti rule applies only when the state relies primarily on a defendant's confession to establish guilt: "The usual statement [of the rule] is to the effect that there must be proof aliunde of the corpus delicti before an extra-judicial confession may be admitted in evidence." Rollin M. Perkins, *The Corpus Delicti of Murder*, 48 Va.L.Rev. 173, 179 (March 1962).

■ As the Alaska Supreme Court stated in *Armstrong v. State*, 502 P.2d 440, 447 (Alaska 1972), the corpus delicti rule provides "that a criminal conviction must rest on firmer ground than the uncorroborated confession or admission of an accused. To avoid convicting a person solely out of his own admissions, the law requires, for a case to be submissible to the trier of fact, additional independent evidence." *See also Castillo v. State*, 614 P.2d 756, 758 (Alaska 1980).

■ Furthermore, even when the state's case rests upon a defendant's confession and the corpus delicti rule applies, that rule does not require criminal agency to be proven by direct evidence; either circumstantial or direct evidence will suffice if its persuasive force is sufficiently corroborative of the defendant's confession. *Castillo*, 614 P.2d at 758–59.

■ Corpus delicti is simply irrelevant here. The state did not seek to establish McDonald's guilt by relying primarily on his confession. In fact, McDonald did not confess. The essence of McDonald's complaint is that murder cannot be proven by circumstantial evidence alone or, in any event, that the circumstantial evidence here was insufficient to convict him of murder. The law, however, recognizes no categorical distinction between direct and circumstantial evidence. *Des Jardins v. State*, 551 P.2d 181, 184–85 (Alaska 1976); *Willett v. State*, 836 P.2d 955, 957 (Alaska App.1992).

■ Nor was the evidence of guilt in this case—although largely circumstantial—too sparse to support McDonald's murder conviction. Reviewing the evidence and the inferences drawn therefrom in the light most favorable to the state, we conclude that sufficient evidence was presented to allow fair-minded persons to reasonably differ on whether guilt has been established beyond a reasonable doubt.

McDonald's motions for judgment of acquittal were properly denied.

### 8. *Jury Instructions*

McDonald challenges the trial court's refusal to give two jury instructions that he proposed: Proposed Instruction No. 15, which addressed the impact of circumstantial evidence on a jury's determination of guilt, and Proposed Instruction No. 16, which clarified the relationship between circumstantial evidence and specific intent.

McDonald also contends that the trial court erred in giving Instruction 32, dealing with intent, and Instruction 24, an instruction addressing the elements of murder. He did not object to these instructions at trial. McDonald lastly asserts that the instructions as a whole were confusing and unconstitutional. McDonald did not raise this argument below.

The decision whether to give a requested jury instruction is committed to the trial court's discretion. *Buchanan v. State,* 561 P.2d 1197, 1207 (Alaska 1977); *Lee v. State,* 760 P.2d 1039, 1041 (Alaska App. 1988). McDonald's challenge to the trial court's decision will succeed only if the trial court abused its discretion. *Id.* The jury instruction issues that McDonald raises for the first time on appeal are reviewable only for plain error. *Wilson v. State,* 670 P.2d 1149, 1152–53 (Alaska App.1983).

### a. McDonald's Proposed Instructions

McDonald's Proposed Instruction No. 15 stated that "[e]ach fact which is essential to complete a set of circumstances necessary to prove the defendant's guilt must be proved beyond a reasonable doubt." His Proposed Instruction No. 16 would have required the jury to adopt a "reasonable inference pointing to innocent intent over a reasonable inference pointing to guilty intent."

Both of McDonald's instructions are based on the mistaken premise that, to base a verdict of guilt on circumstantial evidence, the jury must be able to find that the evidence rules out any conclusion consistent with innocence and is consistent only with guilt. This theory of circumstantial evidence was abandoned in *Allen v. State,* 420 P.2d 465 (Alaska 1966), and, since *Allen,* has been repeatedly rejected. *See, e.g., Jacobson v. State,* 551 P.2d 935, 939–40 (Alaska 1976). As we have already indicated, Alaska law draws no distinction between circumstantial and direct evidence.

McDonald does not contend that the reasonable doubt instructions actually given by the court were improper. His proposed instructions would have misinformed the jury as to applicable law. We conclude that the trial court did not abuse its discretion in rejecting McDonald's proposed instructions.

### b. Instruction No. 32

McDonald argues that the language of Instruction No. 32, which told the jury that "[i]n determining issues of intent, the jury is entitled to consider any statements made, and acts done or omitted by an ac- cused, and all facts and circumstances in evidence ...," allowed the jury "to engage in the impermissible inference that it *could* consider Mr. McDonald's failure to testify or to make a full statement to the police ... in determining *intent,* as distinct from determining guilt."

McDonald's argument assumes a strained and unreasonable interpretation of the challenged instruction. On its face, the instruction merely apprised the jury that circumstantial evidence may be enough to find intent. To be misled, the jury would have had to conclude that McDonald's failure to testify amounted to an "act done or omitted by an accused," and so, could be considered. Yet the trial court expressly admonished the jury, in both Instruction No. 3 and Instruction No. 14, that it should not draw any inference "of any kind" from the defendant's decision not to testify. Reading the instructions as a whole, as the jury was expressly told to do, we conclude that Instruction 32 did not unconstitutionally draw attention to McDonald's failure to testify.

McDonald also believes that, by instructing the jury that it was entitled to consider "all the facts and circumstances in evidence," Instruction No. 32 might have led jurors to consider evidence admissible only against Ibach in its determination of McDonald's intent. Although McDonald acknowledges that the jury was specifically reminded in a separate instruction "that some statements were admissible only as to Ibach," McDonald argues that the jury might have interpreted this instruction to apply only to its determination of facts relating to conduct, and not to its consideration of evidence bearing on the issue of McDonald's intent.

Again, however, the argument presumes a strained interpretation of the instructions by the jury. Instruction No. 8 expressly told the jury that "you must not consider [evidence admitted against one defendant and not another] as against the other defendant." Nothing in this instruction suggested in any way that it was restricted to the jury's determination of the defendants' conduct as opposed to their intent. These instructions precluded the jury from adopting Mc-

Donald's strained reading of Instruction 32. *Whiteaker v. State*, 808 P.2d 270, 277 (Alaska App.1991) (stating "[j]urors are presumed to understand and follow the jury instructions").

■ McDonald also argues that Instruction No. 32 was the equivalent of an impermissible *Mann* [10] instruction: one that creates a presumption of intent based on conduct. He claims that the instruction shifted the burden of proof to him by failing to give the jury the option to disregard the defendant's acts and omitting the "necessary clarification that such inferences must be believed *in conjunction* with other facts that support the inference."

In *Gargan v. State*, 805 P.2d 998, 1005 (Alaska App.1991), we considered a similar argument regarding a functionally identical instruction. We held that the instruction was proper and not an abuse of discretion in a specific intent case. *Id.* at 1005–06; *see also Calantas v. State*, 608 P.2d 34, 36 (Alaska 1980). As in the present case, the instruction in *Gargan*

> told the jury that they could infer that the defendant intended the natural consequences of his actions, they were not required to make such a finding, and that the prosecution maintained the burden of proof on the issue. When taken together with all the other instructions reiterating the prosecutor's burden of proof, we are convinced that the instruction was proper and there was no abuse of discretion[.]

*Gargan*, 805 P.2d at 1005. We find *Gargan* controlling here.

In short, we find no plain error in the trial court's use of Instruction No. 32.

#### c. Instruction No. 24

■ McDonald next challenges the language of Instruction No. 24, which, as to the murder charge, informed the jury that the state was required prove beyond a reasonable doubt that McDonald "caused the death of Laura Henderson, solicited another person to cause her death, or aided or abetted another in planning or committing the acts causing the death of Laura Henderson." McDonald contends that this language might

have deprived him of jury unanimity, because some jurors might have concluded that he aided or abetted Henderson's murder, while others might have concluded that he committed the murder as a principal.

However, a jury is not required to be unanimous as to whether a defendant acted as a principal or as an accomplice. *Miller v. State*, 866 P.2d 130, 137 (Alaska App.1994); *Totemoff v. State*, 866 P.2d 125, 129 (Alaska App.1993). McDonald was not deprived of his right to a unanimous jury verdict. We find no plain error.

#### d. Cumulative Error in Jury Instructions

McDonald also contends that the jury instructions as a whole were unconstitutional because they were "so inconsistent and confusing ... that a reasonable juror would not have considered the record as a whole." He argues that the jury instructions were self-contradictory because they simultaneously told the jury to consider some evidence only against certain defendants and all of the evidence as to each defendant.

As we have noted, McDonald failed to express this concern at the trial court level. Ironically his argument that the instructions were collectively inconsistent and misleading is based on a comparison of individual instructions out of context. We have found no error in the individual instructions. We find no plain error in the instructions as a whole.

#### 9. *Motions for New Trial*

Shortly after McDonald was convicted for the kidnapping and murder of Henderson, he moved for a new trial based on newly discovered evidence. McDonald also sought a new trial based on the claim that the police had destroyed exculpatory evidence, thereby depriving him of his right to due process. After holding several evidentiary hearings to consider McDonald's claims, the trial court denied McDonald's new-trial motion. McDonald argues that the trial court erred in denying his motion for a new trial.

---

**10.** *Mann v. United States*, 319 F.2d 404 (5th Cir.1963).

### a. Newly Discovered Evidence

#### (i) Standard of Review

We first consider McDonald's newly-discovered evidence claim. The requisite criteria for securing a new trial based on a claim of newly discovered evidence are as follows:

(1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, *i.e.,* discovered after the trial; (2) the motion must allege facts from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved; and (5) must be such as, on a new trial, would probably produce an acquittal.

*Salinas v. State,* 373 P.2d 512, 514 (Alaska 1962) (quoting *Pitts v. United States,* 263 F.2d 808, 810 (9th Cir.1959)). It is the trial judge's duty "to assess the credibility of the newly discovered evidence and to decide the probable impact of that evidence based on [the judge's] view of its credibility." *Gonzales v. State,* 691 P.2d 285, 287 (Alaska App.1984). The trial court's denial of a new-trial motion is within its sound discretion and will not be disturbed unless an abuse of discretion is shown. *Id.* at 286. Denial of a motion for a new trial constitutes an abuse of discretion only when it is "clearly untenable or unreasonable." *Id.*

#### (ii) New Evidence Pointing to McLaughlin

McDonald based his claim of newly discovered evidence on information that, in his estimation, indicated that a Kodiak drug dealer named McLaughlin,[11] had the motive and the opportunity to kill Henderson. Although McDonald called numerous witnesses to testify at the evidentiary hearings, only four were central to his primary claim of newly discovered evidence: Guy Carroll, Michael Putnam, Marvin Newland, and George Lee.

The first of these witnesses, Guy Carroll, testified that approximately six months before Henderson's disappearance, a Kodiak drug dealer, Peter Bail, asked if Carroll was interested in making some money. When Carroll said yes, Bail dialed the telephone and handed it to Carroll. The speaker, known to Carroll only as "Jack," offered Carroll $25,000–30,000 to kill a woman. Carroll testified that he later told his friend Michael Putnam about "Jack's" offer. According to Carroll, Putnam had already heard that someone wanted a woman killed. Carroll testified that Putnam told him the woman had to be killed because she was getting ready to inform on some people.

Carroll further claimed that six months later—after Henderson disappeared—he was with Putnam when Putnam noticed Henderson's picture in the paper. According to Carroll, Putnam commented that Henderson was the one "we were approached on." Carroll took this comment to mean that Henderson was the person "Jack" had wanted killed.

Carroll also testified that he first told the police about his conversation with "Jack" around the time that the grand jury's investigation of McDonald was in progress. Although Carroll apparently had not known who "Jack" was when he spoke with the police, he testified at the evidentiary hearing that he had since heard Ibach's voice and that Ibach was not the "Jack" on the other end of the phone. He testified that he now believes that the voice belonged to a Kodiak drug dealer named McLaughlin. Carroll added that Putnam must have learned about his statements to the police, because, shortly thereafter, Putnam became angry and assaulted him, evidently for going to the police.

Michael Putnam, another witness McDonald relied on in support of his motion for a new trial, arguably corroborated Carroll's testimony in minor respects, but flatly contradicted it in most. Putnam swore that Carroll had never told him about any contract to kill a woman. He testified that he never saw Henderson's picture in the paper. Although Putnam did admit that he had gotten into a fight with Carroll, he insisted that

---

**11.** Testimony at the evidentiary hearings on McDonald's motion for a new trial referred to both a Michael McLaughlin and a James McLaughlin.

Apparently, Michael and James are brothers. For the purposes of this appeal, we need not distinguish between them.

the fight occurred because Carroll was "going around bragging that he did some murder ... and he didn't know anything about anything, other than what I'd told him." Putnam acknowledged being approached in October of 1985 about a contract killing, but, according to Putnam, the man who approached him was James Kerwin—the same James Kerwin who was originally charged with McDonald and Ibach for abducting and murdering Henderson. Putnam explained that Kerwin had offered him $40,000 to kill somebody; Kerwin did not say if the intended victim was a man or a woman, or who wanted the person killed.

The third witness supporting McDonald's newly-discovered evidence theory was Marvin Newland. The sole relevance of Newland's testimony was to support Carroll's claim that he had been assaulted by Putnam for discussing his knowledge of Henderson's disappearance with the police. Newland, however, had only observed a fight involving the two men. He did not know why Putnam had fought with Carroll; he speculated that it could have been either because Carroll had told the police about Henderson or because Carroll had told the police about a burglary Carroll and Putnam had committed.

George Lee, an acquaintance of McDonald, was the fourth witness ostensibly supporting the new-trial motion. Lee was evidently called because McDonald believed that Lee could implicate McLaughlin in Henderson's disappearance. But Lee's testimony fell somewhat short of the mark. Lee testified that he had attended a party at McLaughlin's house sometime after McDonald was convicted for Henderson's kidnapping and murder. Lee recalled that, during a discussion about Henderson's disappearance, McLaughlin told him, "The bitch knew too much [about his drug business] and had to be shut up." However, according to Lee, McLaughlin also told Lee that he (McLaughlin) would not want "to get brought down over someone else's [domestic] problem."

McDonald argues that the testimony of these four witnesses warranted a new trial because, if it had been presented at trial, it might have led to his acquittal. After considering the totality of the evidence presented at the post-trial hearings, however, the trial court found that "none of the evidence standing alone or considered cumulatively, would likely produce an acquittal."

Although there is sound basis in the record to suggest the contrary, we assume for purposes of this decision that the disputed evidence qualified as "newly discovered." Our review of the record nonetheless convinces us that the trial court's decision was neither "clearly untenable [n]or unreasonable" in its finding that the inconclusive and mutually contradictory testimony of these witnesses would not have been likely to produce an acquittal. *Gonzales v. State*, 691 P.2d 285, 286 (Alaska App.1984). Accordingly, we conclude that the trial court did not abuse its discretion in refusing to find that a new trial was warranted on the ground of newly discovered evidence. *Id.* at 286–87.

### (iii) New Evidence Pointing to Police Coverup

■ McDonald also raises a related, but slightly different theory to support his contention that a new trial was necessary because of newly discovered evidence. McDonald contends that the evidence presented at the hearings below indicated that the police had actively suppressed evidence favorable to the defense, including much of the newly discovered evidence that derived from the witnesses discussed above. McDonald maintains that if this evidence of a police coverup were presented at a new trial, it might result in his acquittal.

At the evidentiary hearing, Newland testified that Kodiak Police Corporal John Palmer tape recorded the statement that Newland had given to the police. Carroll also testified that two of his statements to the police were tape recorded: one by Kodiak Police Officer William Rhodes and one by Kodiak Police Officer Barry Paris. McDonald also presented Wayne Arndt's testimony to support his coverup theory. Arndt, a commercial fisher, claimed that he told the Alaska State Troopers he had discovered a female's body in Buskin Bay five or six months after

Henderson's disappearance.[12] McDonald maintained that he had not been provided with any of the recorded interviews and had not been informed of Arndt's report to the Alaska State Troopers.

The testimony of the state's post-trial witnesses, however, tended to contradict Newland's and Carroll's claims. At the time of the hearings, the Kodiak Police Department had no tape recordings of interviews with either Newland or Carroll and the department's files contained nothing to indicate that such recordings had been made. Palmer had no recollection of taking a statement from Newland, let alone tape recording one. Rhodes recalled his conversation with Carroll, but testified that it had not been tape recorded. Paris acknowledged that he had recorded one interview with Carroll early on in the investigation; he said that he had kept the tape in his desk until he left the Kodiak Police Department in August of 1989 (over two years after McDonald's convictions for kidnapping and murdering Henderson). Although Paris did not know what had happened to the tape, the state established that a written summary of Paris' interview with Carroll had been provided to the defense prior to trial; no pretrial request for further discovery materials in connection with Carroll, or for a recording of his interview, had been made by the defense. With respect to Arndt, the Alaska State Troopers searched their files, but could find no record of a report.

McDonald concludes that the absence of Newland's and Carroll's tape-recorded statements and the fact that no record of Arndt's citizen report was found by the troopers supports his theory that police investigators purposely suppressed exculpatory evidence. The trial court found, however, that Newland was not credible and that his testimony about being tape recorded was "improbable." The court also did not believe that Carroll's conversation with Rhodes had been tape recorded. Although the court found that Carroll's statement to Paris had probably been recorded, it further found that the "negligent failure" to provide the taped statement was harmless, as the written summary given to the defense was "reasonably accurate." Finally, the court found that Arndt was "not a credible witness" and that it was unlikely that a formal statement had been taken from him.

Based on these findings, the trial court concluded that McDonald's theory of a police coverup was meritless. The trial court's findings as to the credibility of McDonald's coverup witnesses are not clearly erroneous. Evidence of the alleged police coverup was conjectural, at best, and the substantive value of the evidence purportedly "covered up" was of minor and tangential significance. Under the circumstances, the trial court could readily find that, if presented to the jury at a new trial, the coverup evidence would not have been likely to produce an acquittal; the trial court did not abuse its discretion in denying McDonald's motion for a new trial based on this evidence. *Gonzales,* 691 P.2d at 287.

### b. Dismissal: Destruction of Exculpatory Evidence

 Relying on the same evidence that he used in connection with his theory of a police coverup, McDonald asserted a separate due process argument to support his motion for a new trial. McDonald contended that destruction by the police of Carroll's and Newland's taped statements and Arndt's citi-

---

12. The substance of Arndt's statements appears to have no exculpatory value in and of itself. Arndt testified that in October or November of 1986 he told the police that he had discovered a bag with a body in it in the Buskin River area. Arndt said he had seen what looked like a leg clothed in a pair of Levis, a foot covered with a sock, and a female's tennis shoe.

Although McDonald contends that Arndt's testimony shows that Henderson's "body may actually have been abandoned in a totally different location than that on which the police and prose-

cution based their case," it is clear that whatever Arndt witnessed was in fact unrelated to Henderson's disappearance. By October of 1986, Henderson's jeans and tennis shoes had already washed up along the tideline in Monashka Bay and had been positively identified. Accordingly, it appears to us that the only relevance of Arndt's testimony is to support McDonald's theory that the police investigators attempted to suppress evidence that tended to exculpate McDonald and that the suppression itself is newly discovered evidence.

zen report amounted to a denial of due process and warranted a new trial.

Our conclusion that the trial court was not clearly erroneous in discrediting most of McDonald's police coverup evidence disposes of McDonald's due process theory, as well.[13] In any event, "[d]estruction of evidence violates due process only if the evidence 'might have led the jury to entertain a reasonable doubt about the defendant's guilt.'" *Williams v. State*, 629 P.2d 54, 64 (Alaska 1981) (quoting *Wyrick v. State*, 590 P.2d 46, 46 n. 1 (Alaska 1979)). Here, as we have noted above, the disputed evidence had minimal exculpatory value. Even assuming, contrary to the trial court's findings, that Newland's statement was tape recorded and both of Carroll's statements were as well, there is simply no reason to suppose that this evidence would have led the jury to entertain a reasonable doubt about McDonald's guilt. Notably, McDonald makes no claim that Carroll's, Newland's or Arndt's supposedly destroyed statements, had they been preserved and disclosed, would have revealed anything the witnesses could not have supplied themselves through their testimony. Under the circumstances, it is far from clear that McDonald lost any exculpatory evidence, even if his theory of destruction were accepted at face value.

We find no error in the trial court's rejection of McDonald's post-trial motions.

10. *Cumulative Error*

McDonald contends that the cumulative effect of the trial court's errors requires the reversal of his conviction. This court has found almost all of McDonald's claims of error to be without merit. His claim of cumulative error is, therefore, meritless as

well. *Drumbarger v. State*, 716 P.2d 6, 16 (Alaska App.1986).

STATE'S PETITION FOR REVIEW

 At the sentencing hearing, the trial court held that Alaska's constitutional prohibition against double jeopardy precluded the court from sentencing McDonald for his kidnapping conviction. The trial court recognized that the kidnapping and murder statutes protect "clearly different societal interests," but stated that, because the jury reached general verdicts on the charges, "it is impossible to know exactly what specific facts the jury found to support" each conviction. Under the circumstances, the court concluded that McDonald's kidnapping conviction merged with his conviction for murder in the first degree. The court sentenced McDonald to the maximum term of ninety-nine years for the murder, but declined to impose a sentence on the kidnapping conviction. In reaching this conclusion, the trial court made it clear that its ruling was based on the peculiar circumstances of McDonald's case:

> If the evidence were to point that Ms. Henderson had been transported to some location, anywhere, and then there was evidence, evidence I could point to that at that point she was taken from the van and killed, this would be an entirely different case and what I did here today would be entirely different.

In its petition for review the state claims that the trial court erred in refusing to sentence McDonald for kidnapping. The state argues—as the trial court recognized—that kidnapping and murder ordinarily involve different conduct, culpable mental states, and societal interests. The state argues that the trial court's view of the evidence implies that

---

**13.** The trial court apparently did find that Paris was negligent in failing to preserve the interview of Carroll that he had tape recorded and kept in his desk drawer until leaving the Kodiak Police Department. McDonald argues that the destruction of this evidence violated Alaska Criminal Rule 16 and that this violation should also have served as a basis for awarding him a new trial. This contention is meritless. When destruction of evidence was not in bad faith or part of a deliberate attempt to avoid production, sanctions will be imposed on the state only if the defendant

was prejudiced. *See Putnam v. State,* 629 P.2d 35, 43 (Alaska 1980). Here, the trial court expressly found that "the failure to furnish the tape of Guy Carroll's statement had [no] effect—appreciable effect anyway—on the defense, the jury, or the outcome of the case." This finding is supported by the record and is not clearly erroneous. Given the lack of discernible prejudice, the trial court did not abuse its discretion in declining to order a new trial as a sanction for the alleged discovery violation.

the state did not prove both offenses beyond a reasonable doubt. In addition, the state argues that it is reasonable to infer from the evidence that Henderson was not killed in the van because there was very little human blood found within the van and the only evidence of struggle was the broken window.

Under AS 11.41.300(a)(1)(C), kidnapping occurs when a "person restrains another with intent to . . . inflict physical injury[.]" In *Alam v. State*, 776 P.2d 345, 349 (Alaska App.1989), this court held that the evidence of restraint necessary to establish kidnapping must go beyond that which is incidental to the underlying offense. *See also* Commentary and Sectional Analysis for the 1980 Amendments to Alaska's Revised Criminal Code, Senate Journal Supp. No. 44 at 5–6, 1980 Senate Journal (movements that are merely incidental to the commission of another crime do not fall within AS 11.41.300). This court also recognized that the jury must be informed that "restraint that was merely incidental to a sexual or physical assault could not constitute kidnapping or attempted kidnapping." *Alam*, 776 P.2d at 350 n. 4.

In the present case, which was tried before we decided *Alam*, the jury was not instructed that, for purposes of the kidnapping charge, it was required to find an act of restraint going beyond any act incidental to Henderson's murder. The jury instructions left open the possibility that the verdict of guilt on the kidnapping charge was based on the jury's finding of an act of restraint that was integral to the conduct on which it based McDonald's conviction for murder.

The state argues that such a verdict was extremely unlikely in McDonald's case, since strong circumstantial evidence indicated that Henderson had been transported from the scene of her meeting with McDonald at the cannery before she was killed. As the trial court properly recognized, however, this argument misses the point. Because the instructions actually given to the jury left open the possibility of a kidnapping verdict based on restraint incidental to acts involved in Henderson's murder and because the jury rendered general verdicts, it is impossible to determine with reasonable certainty the conduct upon which the jury based its verdict. As we have previously recognized, conjecture based on the relative strength of competing theories of guilt can be no substitute for certainty when the double jeopardy clause is implicated. Any ambiguity must be resolved in favor of the accused. *Clifton v. State*, 758 P.2d 1279, 1285 (Alaska App.1988); *Horton v. State*, 758 P.2d 628, 632 (Alaska App.1988).

Here, the trial court properly recognized the potential violation of McDonald's double jeopardy rights and declined to impose a sentence for kidnapping. The trial court did not err in so deciding.[14]

## CONCLUSION

The judgment of conviction is AFFIRMED.

MANNHEIMER, J., not participating.

---

**14.** As the state acknowledges in its brief, a finding of merger not only precludes sentencing on the merged offense, but also requires the conviction for the merged offense to be vacated. *See Allain v. State*, 810 P.2d 1019, 1021 (Alaska App. 1991). Here, the trial court declined to sentence McDonald for kidnapping but neglected to vacate the kidnapping conviction. On remand, the judgment should be amended to reflect that McDonald's kidnapping conviction has been vacated.