STATE of Alaska, Appellant,

v.

Allen SAVO, Appellee.

No. A–8583.

Court of Appeals of Alaska.

March 11, 2005.

---

Michael Sean McLaughlin, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellant.

J. Adam Bartlett, Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Four years ago, Allen Savo was convicted of first-degree sexual assault for raping his former girlfriend, S.W. Following his conviction, Savo filed a petition for post-conviction relief, alleging that he had received ineffective assistance of counsel from his trial attorney, Assistant Public Defender Steven Wells.

Savo's petition went to trial. Based on the evidence presented, Superior Court Judge Fred J. Torrisi concluded that Savo had indeed received ineffective assistance from Wells; the judge accordingly granted Savo a new trial. The State now appeals this ruling. For the reasons explained here, we conclude that even when the evidence is viewed in the light most favorable to Savo, the evidence fails to establish Savo's claim of ineffective assistance of counsel. We therefore reverse the superior court's ruling and reinstate Savo's conviction.

*Underlying facts: the evidence and the defense theory of the case at Savo's criminal trial*

Savo was in a romantic relationship with S.W. during 1997–99, but their relationship was not always harmonious. In May 1999, Savo was charged with assaulting S.W.; the assault was apparently precipitated when S.W. expressed dissatisfaction with the relationship. (During the assault, Savo told S.W., "If you leave, I will kill myself.")

As a condition of his bail release, Savo was prohibited from contacting S.W. But despite this no-contact order, Savo and S.W. continued to see each other (and to have sexual relations) until mid-July 1999.

On July 23, 1999, S.W. was at a social gathering at her mother's house. S.W. testified that Savo called the house early on the morning of the 24th and asked S.W.'s mother "what [S.W.] was doing [and] who she was with." Savo eventually talked to S.W., and S.W. agreed to meet him at his mother's house. S.W. left for Savo's mother's house between 3:00 and 4:00 in the morning on July 24th.

According to S.W.'s testimony at Savo's criminal trial, when she arrived at the house, Savo grabbed her and threw her to the floor, and then he began assaulting her and verbally abusing her. S.W. attempted to escape by going into a bedroom, locking the door, and then trying to climb through a window, but Savo thwarted this attempt. Savo pushed S.W. into his mother's bedroom and took her clothes off. There, despite S.W.'s pleas, Savo proceeded to rape her.

S.W. did not leave the house for some seven hours after the assault. She testified that she stayed with Savo because, every time she tried to leave, Savo would awaken. S.W. also testified that she did not telephone the police because the phone lines had been ripped from the wall.

S.W. eventually left Savo's mother's house around noon. She went to her friend Leah Timmerman's residence. Timmerman testified that S.W. was upset when she arrived, and that S.W. reported that Savo had raped her. A little later, S.W. returned to her own mother's house, and from there she called the police.

S.W.'s testimony at Savo's criminal trial differed in several respects from her pre-trial accounts of the rape. For example, S.W. initially told the police that Savo had pulled her off the street and into the house, although she testified at trial that she had entered the house voluntarily. S.W.'s trial testimony was also inconsistent with the physical evidence. The bedroom door that she said she locked (during her escape attempt) did not lock from the inside. And the telephone that she said had been pulled out of the wall was functional (according to Savo's mother's testimony). Moreover, during the medical examination that was administered to S.W. following her report of sexual assault, the nurse noted multiple bruises over S.W.'s body, and bite marks on her arm, but the nurse did not observe any lesions on S.W.'s genitalia (a common sign of forced sexual intercourse).

The medical examination did, however, appear to confirm S.W.'s claim that Savo had had sex with her. S.W.'s vagina contained motile sperm, and a genetic sample collected from S.W.'s vagina was consistent with Savo's DNA. An expert testified that, among the Yup'ik population, the chance that another person would have those same DNA characteristics was 1 in 2,700.

There were other inconsistencies or weaknesses in S.W.'s account of these events. S.W. testified that, when she agreed to meet Savo at his mother's house on the morning of July 24th, she believed that Savo's mother would be home. But Savo's mother testified that she had told S.W. that she would be out of town. Further, S.W. testified that, during the assault, Savo "grabb[ed]" her and "push[ed][her] around"; S.W. claimed that even though she "fought [and] tried [her] hardest", Savo "was just overpowering". Yet S.W. was a considerably larger person than Savo: she weighed 235 pounds compared to Savo's 132 pounds.

S.W. testified that, during the assault, someone came to the door of Savo's mother's house, prompting S.W. to call out for help. But this person never contacted the police and, in fact, his identity remained unknown to the authorities at the time of Savo's trial. S.W. also testified that, when she fled the house, she left some clothes behind, but these clothes never materialized.

Despite Savo's and S.W.'s long-term romantic relationship, Savo's defense attorney, Assistant Public Defender Steven Wells, decided not to argue consent—i.e., decided not to argue that an act of sexual intercourse had occurred between Savo and S.W. on the morning of July 24th, but that S.W. had consented to this act of intercourse. Instead, Wells argued that S.W. had woven the tale of rape from whole cloth because she was angry at Savo for breaking off their relationship.

(When Wells testified at the post-conviction relief evidentiary hearing, he explained that, based on his early interviews with Savo, he initially was going to pursue a defense of consent. But Wells ultimately decided (based on Savo's demeanor and attitude) that Savo would make a poor witness—and that therefore, if possible, it would be better to pursue a defense that did not require Savo to take the stand. According to Wells's post-conviction relief affidavit, he tested his defense theory (that S.W. had invented the claim of rape) by presenting a summary of his intended case to a mock jury. The mock jury acquitted Savo—finding that Wells had presented convincing attacks on the credibility of S.W.'s account of the rape, and that S.W. was lying.)

At Savo's trial, Wells suggested to the jury that "Hell hath no fury like a woman scorned", and Wells presented testimony that, earlier in the summer, S.W. had said to Savo, "I'll put you in jail so [that] you can't

go running ... to your [new] little girl-friend's." Focusing on the inconsistencies and weaknesses in S.W.'s story, as well as potential flaws and incompleteness in the police investigation, Wells argued that the State had failed to prove (beyond a reason-able doubt) that Savo and S.W. had had any sexual encounter on the morning of July 24th.

Despite the arguable weaknesses in the State's case, the jury found Savo guilty. This Court affirmed Savo's conviction on di-rect appeal.[1]

*Underlying facts: Savo's petition for post-conviction relief, and Judge Torrisi's ruling*

Following his conviction (and while his di-rect appeal was pending), Savo filed a peti-tion for post-conviction relief in which he criticized Wells's performance in a number of respects. Savo alleged that Wells had been ineffective in his pre-trial investigation of the case, in his failure to object to various por-tions of the government's evidence, and in his cross-examination of key government wit-nesses (in particular, S.W.).

Wells submitted an affidavit addressing many of these points. Wells also was called as a witness at the evidentiary hearing. Fi-nally, Savo presented the deposition of an experienced criminal trial attorney, William F. Dewey, who criticized certain aspects of Wells's performance. Based on this evi-dence, Judge Torrisi concluded that Wells had been ineffective in his cross-examination of S.W., and he granted Savo's petition on this basis. The judge either expressly re-jected or failed to address all of Savo's other allegations.

*Savo's argument that the State is proce-durally barred from challenging Judge Tor-risi's ruling*

On December 26, 2002, Judge Torrisi ini-tially issued a "Memorandum" in which he rejected certain of Savo's claims of ineffective assistance of counsel but declined to rule on others. Instead, the judge engaged in a conversational treatment of these alleged er-rors, noting various arguable strengths or weaknesses in Savo's claims.

Although the judge described his memo-randum as a "tentative decision" of Savo's claims, and although the judge stated that his purpose in writing the memorandum was to give the attorneys a chance to "see where [he was] headed", the memorandum did not come to any conclusions. That is, Judge Torrisi did not announce that he intended to rule either for or against Savo on any given claim unless he was later convinced different-ly. Rather, the judge stated that "[he was] not wholly comfortable ruling [on Savo's claims] at this point." He told the parties that he would allow them to supplement their final arguments—but not the evidence in the case—with additional memoranda not to ex-ceed ten pages in length.

Almost two months later (on February 24, 2003), Savo filed a supplemental memoran-dum in which he renewed various arguments concerning the purported incompetence of Wells's efforts. The State, for its part, chose not to supplement its final argument with a new memorandum.

Two days after Savo filed his supplemental memorandum, Judge Torrisi issued his final order. In this order, the judge declared (without further explanation) that "the defi-ciencies [in Wells's cross-examination of S.W.] noted at pages 12–18 of [my] Decem-ber memorandum[, taken] together[,] consti-tute ineffective assistance of counsel".

■ Based on this procedural history, Savo now argues that the State is estopped from appealing Judge Torrisi's ruling. He relies on the principle that an appellant can not rely on arguments that were not raised in the trial court.[2] But the State did contest Savo's claims of ineffective assistance, both by arguing that Savo had failed to show that Wells acted incompetently and by arguing that Savo had failed to show prejudice from the alleged attorney errors. The fact that the State failed to respond to Judge Torrisi's invitation for a memorandum restating or supplementing these arguments does not

---

**1.** *Savo v. State*, Alaska App. Memorandum Opin-ion No. 4588 (July 10, 2002), 2002 WL 1467430.

**2.** *See, e.g., Wettanen v. Cowper*, 749 P.2d 362, 364 (Alaska 1988).

constitute a waiver of arguments presented before.

■ Moreover, this Court has previously indicated that a court should not grant relief to a defendant simply because of the government's procedural default. Even when the government fails to respond to the defendant's contentions, a court should grant relief to a defendant only when the defendant proves entitlement to relief: "A person seeking court action must plead facts that demonstrate his or her legal entitlement to the requested action; this is true whether or not an opposing party files a response." *Willie v. State*, 829 P.2d 310, 312 (Alaska App.1992).

■ Federal courts follow the rule that a court should not award default judgement against the government in a proceeding for post-conviction relief.[3] We adhere to this same rule.

We therefore turn to the merits of Judge Torrisi's decision, to determine whether the record supports his findings of ineffective assistance of counsel.

*Judge Torrisi's ruling that Wells's cross-examination of S.W. was incompetent*

Judge Torrisi found that Wells's cross-examination of S.W. was incompetent in several respects.

*(a) Wells's failure to cross-examine S.W. concerning the precise date and time of her last consensual sexual intercourse with Savo*

■ First, Judge Torrisi ruled that Wells was incompetent because he failed to pin down S.W. concerning the precise date and time when she and Savo last had consensual sex. As explained above, motile sperm were found in S.W.'s vagina during the sexual assault examination on the afternoon of July 24th. According to the expert testimony presented at Savo's criminal trial, the fact that the sperm were still motile meant that the act of intercourse had most likely occurred within 48 hours of the examination. The expert stated that this act of intercourse could not have occurred four days prior.

If Savo's attorney had adopted a defense of consent, then the presence of the sperm would not have been an issue. But, as explained above, Wells chose to argue that S.W. was lying when she reported that she and Savo had engaged in an act of sexual intercourse on the morning of July 24th. As Judge Torrisi correctly noted, one of the problems of adopting this defense was how to explain the presence of the matching sperm in S.W.'s body.

At Savo's trial, S.W. testified that she and Savo had broken off their relationship in the days just prior to the sexual assault. S.W. stated that the relationship ended "a couple of days" prior to July 24, 1999—and that she and Savo continued to have consensual sexual relations until a day or two prior to this break-up. Thus, viewing the evidence in the light most favorable to the State, S.W. and Savo's last act of consensual intercourse was approximately four days before July 24th—too early to explain the presence of the sperm in S.W.'s body on the afternoon of July 24th.

Wells did not cross-examine S.W. on this point. Rather, during his summation to the jury, he expressly argued that S.W. and Savo had had sexual intercourse within a couple of days of July 24th. Regarding S.W.'s statements that their last act of consensual intercourse had been earlier than that, Wells pointed to the various factors indicating S.W.'s general lack of credibility, and then he asked the jurors, "Do you think she's telling the truth about how frequently they had sex [and] about when was the last time they had sex?" Wells suggested that S.W. and Savo had consensual sex on the afternoon of July 23rd—*i.e.*, on the afternoon before the alleged rape—and that this would explain the presence of motile sperm on the afternoon of July 24th.

In his decision, Judge Torrisi faulted Wells for failing to impeach S.W. with her grand jury testimony and her statements during the sexual assault examination on the afternoon of July 24th. According to Judge Tor-

---

**3.** *See Aziz v. Leferve*, 830 F.2d 184, 186 (11th Cir.1987); *Bermudez v. Reid*, 733 F.2d 18, 21 (2nd Cir.1984).

risi, this evidence indicated that S.W. and Savo "had last had consensual sex a day or two before she was raped". However, Judge Torrisi overstated this evidence. At grand jury, S.W. testified that her last consensual sexual intercourse with Savo occurred "a couple of days or so" before the evening of July 23rd–24th. And during the sexual assault exam, S.W. told the interviewing officer (Officer Dennis Varner) that she had broken up with Savo "a couple days" before the assault, and that their last act of consensual intercourse had occurred "[the] day before we broke up". In other words, S.W.'s grand jury testimony and her statements during the sexual assault interview were not strikingly at odds with her trial testimony. Even taken at face value, her accounts did not establish that the couple's last act of consensual intercourse occurred within the 48 hours immediately preceding S.W.'s medical examination on the afternoon of July 24th.

Judge Torrisi noted that, according to Wells's testimony at the post-conviction relief evidentiary hearing, Savo told Wells (in advance of trial) that he and S.W. had consensual sex within eighteen hours of the time S.W. reported that she was raped. In other words, Savo told Wells that this consensual sex occurred sometime on the evening of July 23rd or on the morning of July 24th.

However, Wells decided that it would be a bad idea to have Savo take the stand, and Judge Torrisi did not find that decision to be incompetent. Given that Savo was not going to testify, and in the absence of any other admissible evidence to establish the truth of Savo's assertion, it arguably would have been improper for Wells to cross-examine S.W. in such a manner as to suggest that there was evidence firmly pinpointing her last consensual sexual intercourse with Savo as having occurred on the evening of July 23rd or the morning of July 24th.[4]

■ But more important, as Judge Torrisi himself conceded in his memorandum, Savo

never asked Wells to explain his handling of this issue. In post-conviction relief litigation involving a claim of ineffective assistance of counsel, one of the petitioner's duties is to confront their trial attorney with the acts or omissions that purportedly demonstrate the attorney's incompetence, and ask the attorney to respond. Assuming the attorney is available, if the petitioner fails to confront the attorney with the allegations of error, these unexamined allegations can not form the basis for post-conviction relief.[5]

Thus, regardless of the facts, Judge Torrisi committed an error of law when he ruled in Savo's favor on this claim.

*(b) Wells's failure to cross-examine S.W. concerning the identity of the person who allegedly came to Savo's door during the assault (and who, presumably, would have heard S.W. yelling)*

■ During the sexual assault examination, S.W. told the nurse and the investigating officer that someone had come to the door while Savo was assaulting her:

*Nurse:* And no one else was there in the house with you [during the assault]?

*S.W.:* Mm-hmm. A friend ... stopped by, and I screamed for him to ask him to help me, but [Savo] kind of pushed him out, and shut the door and locked it. No one ever came over....

*Officer Varner:* Do you think anybody may have heard your screaming and hollering?

*S.W.:* I have no clue, but I was screaming at the top of my lungs.

The police were not able to identify this person during their investigation of Savo's case. Wells, too, recognized the importance of trying to identify and locate this person. Clearly, if this person could testify that they stood in the doorway of the house and heard no screaming, this would be a substantial

---

4. *See* Alaska Professional Conduct Rule 3.4(e); *David v. State,* 28 P.3d 309, 312–13 (Alaska App. 2001) (holding that a prosecutor acted improperly by cross-examining a witness concerning certain matters when the prosecutor had no admissible evidence to support the factual predicates of these questions).

5. *Peterson v. State,* 988 P.2d 109, 114 (Alaska App.1999); *see also Steffensen v. State,* 837 P.2d 1123, 1126–27 (Alaska App.1992).

blow to S.W.'s credibility. Wells and his investigator spoke to several people, trying to identify the person who came to the door of Savo's mother's house. However, each person they spoke to denied knowing anything about the incident.

Despite his lack of success in locating the person who came to the door, Wells perceived that the absence of this mysterious person posed a problem for the State: the prosecutor would be forced to explain how it could be that someone came to the door of Savo's mother's house, heard a woman screaming for help, and did nothing.

During Wells's cross-examination of S.W., Wells made sure that S.W. committed herself to the story of the visitor at the door:

*Defense Attorney:* You said [that] you were screaming your lungs out?

*S.W.:* Yes.

*Defense Attorney:* Trying to get somebody to come to your help?

*S.W.:* Yes.

*Defense Attorney:* And during this incident, in fact, somebody did come to the front door.

*S.W.:* Uhm-hm. [yes]

*Defense Attorney:* Somebody knocked on the door, right? ... And you were screaming. And [Savo] went to the front door, didn't he?

*S.W.:* Yep.

*Defense Attorney:* And [Savo] pushed [this person] out?

*S.W.:* Uhm-hm. [yes]

*Defense Attorney:* Okay. And [Savo] was ... doing [all] he could do to make sure that this person could not come into the house, correct?

*S.W.:* [No audible response]

*Defense Attorney:* At that point, you were still screaming, right?

*S.W.:* [No audible response]

...

*Defense Attorney:* But nobody came?

*S.W.:* Nope.

*Defense Attorney:* This person who got pushed out [the door] did not call the police?

*S.W.:* Nope.

Later, when Wells presented his summation to the jury, he relied on this portion of S.W.'s cross-examination. Wells reminded the jurors of S.W.'s account, and then he suggested that it simply did not make sense. Wells argued that if someone had come to the door, and if S.W. was screaming at the top of her lungs (as she testified), then this person surely would have heard S.W. screaming and would have called the police rather than simply walking off into the night. Wells also suggested that S.W.'s account did not make sense in another way: if Savo had been obliged to leave S.W. in order to go to the door and prevent this person from coming into the house, what prevented S.W. from either coming to the door herself, or from calling the police?

During the litigation of Savo's petition for post-conviction relief, it was revealed that, following the conclusion of Savo's trial, a man named Vaughn Clark came forward and identified himself as the person who came to the door of Savo's mother's house. Clark was, in fact, one of the people interviewed by the defense team during the preparation of Savo's defense. At that time, when the defense team asked Clark whether he was the person who came to the door, he denied it. Clark now claimed that his new version of events was the truth—and that he had decided to tell the truth because he felt bad that Savo had been convicted.

. (Strangely enough, even after Clark identified himself as the person at the door, Savo's post-conviction relief attorney never presented any evidence concerning (1) what S.W. would have said if someone suggested to her that Clark was the person who came to the door; and (2) what Clark would have said if he were called to testify about what he saw and heard when he came to Savo's mother's house on the morning of July 24th. There is nothing in the record to indicate what S.W.'s or Clark's answers to these questions would be. It may be that Savo's post-conviction relief attorney recognized that this was a moot issue, since it was undisputed that Wells or his investigator had interviewed Clark before Savo's trial, and Clark had told

them that he was *not* the person they were seeking.)

In his post-conviction relief ruling, Judge Torrisi acknowledged that Wells had apparently not known (until Savo's trial was over) that Clark was (or claimed to be) the person who came to the door. (In fact, even now it is unclear whether Clark was telling the truth when he identified himself as the person at the door; this issue has never been litigated.) Judge Torrisi further acknowledged that, even at the close of the post-conviction relief evidentiary hearing, it remained unclear "what, if anything, Mr. [Clark] could tell us about the night in question." Nevertheless, Judge Torrisi concluded that Wells had demonstrated incompetence when, during his cross-examination of S.W., Wells failed to press S.W. to reveal the identity of the person who came to the door, and failed to ask S.W. why she had declined to provide this person's name to the police who were investigating the rape.

The judge conceded that "[t]here is some risk when you ask a question in the dark like this", but the judge concluded that it was "unlikely that [S.W.] would name some [person] who would then come [to court] and say, 'You know, you're right, I did hear a lot of screaming that night.' " The judge therefore concluded that it was a "mistake [for Wells] not to have inquired further"—even though the judge acknowledged that he had "no idea [how] [S.W.] [might] have responded" if she had been asked such questions.

Judge Torrisi's ruling is based on a series of speculative inferences that find little or no support in the record and that are, as a legal matter, insufficient to establish ineffective assistance of counsel.

First, Judge Torrisi appears to have assumed (based on S.W.'s use of the word "friend") that S.W. knew the identity of the person who came to the door. But S.W.'s use of this word was arguably ambiguous. From the wording of her statement, S.W. might have been referring to someone who was an acquaintance of hers, but she might instead have been referring to someone whom she recognized as an acquaintance of Savo's—or, alternatively, someone whom she inferred was an acquaintance of Savo's (based on the fact that this person came to the door, and that Savo conversed with this person).

At any rate, if—as Judge Torrisi apparently believed—S.W.'s knowledge of the identity of the visitor at the door was central to Savo's claim of ineffective assistance of counsel, it was Savo's burden (as the petitioner for post-conviction relief) to prove this fact by clear and convincing evidence.[6] To the extent that Judge Torrisi's ruling implies that he found that Savo had proved this fact by clear and convincing evidence, the judge's finding is clearly mistaken.

Next, Judge Torrisi concluded that Wells was incompetent for failing to question S.W. about the identity of the visitor at the door even though the judge had no idea what S.W.'s answers would have been. Judge Torrisi declared that it was "unlikely" that S.W. would have identified a person who would then come to court and corroborate her story. But this is complete speculation. There are famous instances in our judicial history of people who heard crime victims screaming for help, yet turned away and did nothing because they did not wish to get involved.[7] This may have been true in Savo's case. There is no way of knowing—because the record contains no basis for drawing a conclusion one way or the other.

Judge Torrisi did not know what S.W.'s answers would have been, or what further evidence those answers might have led to, because Savo failed to present evidence on these points—thus failing to meet his burden to prove his claim for post-conviction relief. See *State v. Jones*, 759 P.2d 558, 573–74 (Alaska App.1988), where this Court held that when a petitioner for post-conviction relief criticizes their trial attorney's failure to

---

6. AS 12.72.040.

7. For example, in the spring of 1964, a woman named Catherine Genovese was murdered outside her home in Queens (New York); thirty-eight witnesses heard her cries and yet did nothing to summon help or to save her. *See* Mark Gado, *A Cry in the Night*, http://www.crimelibrary.com/serial—killers/predators/ kitty—genovese/ (last visited January 24, 2005).

pursue avenues of investigation or cross-examination, it is the petitioner's burden to produce evidence "to show that independent testing would likely have yielded exculpatory evidence, [or] that potential witnesses would actually have given favorable testimony, or that additional cross-examination would have weakened the state's case".

In addition, Judge Torrisi's ruling appears to constitute an improper second-guessing of Wells's litigation strategy. As explained above, Wells understood the importance of trying to identify the person who came to Savo's mother's door. But when he could not find the person (despite diligent effort), Wells concluded that he could present Savo's defense without knowing this person's identity—because (as explained above) Wells could argue that the *State's* failure to identify this person showed that S.W.'s story could not be true. Thus, Wells adopted a litigation strategy that did not require him to further investigate the identity of the visitor at the door—and that did not require him to press S.W. to reveal whatever she knew about this person.

Judge Torrisi did not find that this litigation strategy was incompetent—and, to the extent that his ruling implies such a finding, we conclude that the finding would be clearly erroneous. While a different attorney might have chosen to litigate Savo's case differently, Wells's approach to this issue was well within the acceptable range of competence.

*(c) Wells's failure to cross-examine S.W. concerning the discrepancy in body size between herself and Savo, and concerning her statement to the grand jury that Savo had thrown her around "like a rag doll"*

■ As explained above, when S.W. testified at Savo's criminal trial, she claimed that Savo had thrown her around and had overpowered her. Indeed, when S.W. testified at grand jury, she described herself as being thrown around "like a rag doll". However, as also explained above, S.W. was a considerably larger person than Savo; she outweighed him by 100 pounds. (S.W. weighed 235 pounds compared to Savo's 132 pounds.)

When Wells cross-examined S.W., he did not expressly question her concerning this discrepancy in body sizes, nor did he confront her with the "rag doll" statement from her grand jury testimony. Judge Torrisi indicated that he believed that Wells made a mistake (either of tactics or omission) by failing to ask such questions.

We do not agree. The jury was able to observe both S.W. and Savo. The hundred-pound discrepancy in their weights must have been obvious to the jurors, and it was reasonable for Wells to assume that, even without express cross-examination on this point, the jurors would perceive that this difference in body size was a relevant factor in assessing the credibility of S.W.'s testimony that Savo had thrown her around and had overpowered her. Indeed, when Wells presented his summation to the jury, he pointed to the discrepancy in S.W.'s and Savo's body size, and he suggested that it was implausible that Savo could have overpowered S.W.

Moreover, in the post-conviction relief proceedings, Wells explained that he wished to minimize his direct confrontation of S.W. so as to avoid the appearance that he was "browbeating" the purported victim of a sexual assault. Instead, Wells adopted the strategy of using his cross-examination "to get [S.W.] to commit to [the] set of facts that she had described [at] the grand jury and in [her] various [pre-trial] statements", and then showing (through the testimony of other witnesses) that this set of facts was inconsistent with the physical evidence.

We conclude that Wells's approach to this issue was within the range of competence required of criminal law practitioners.

*(d) Wells's purported failure to cross-examine S.W. concerning her conflicting accounts of how she arrived at Savo's mother's house on the night / morning of the assault*

■ S.W. gave conflicting accounts of how she ended up at Savo's mother's house on the night / morning of the sexual assault.

S.W. consistently asserted that she had been given a ride to the Dillingham HUD housing, where both Savo's mother and S.W.'s friend, Leah Timmerman, resided. During her sexual assault examination, and in her initial police interview, S.W. stated that she had asked the driver to drop her off

up the street from Timmerman's apartment. (S.W. said that she wished to walk a little, apparently because she was feeling sick from drinking.) In these initial interviews, S.W. claimed that, while she was walking Savo grabbed her and took her inside his mother's house.

But at grand jury, S.W. gave a different account. She testified that her destination that night was Savo's mother's house, because Savo called her up and asked her "to [come] over and see him". According to S.W.'s grand jury testimony, she went to Savo's mother's house and knocked on the door—and it was then (when Savo answered the door) that Savo grabbed her.

At trial, S.W. modified her account again, combining aspects of her two earlier accounts. S.W. testified that she spoke to Savo on the telephone (while she was still at her mother's house), and then she caught a ride to the HUD housing, where her initial destination was Leah Timmerman's house. S.W. testified that, while she was at Timmerman's house, Savo called her and asked her to come over to his mother's house. She then walked over to Savo's mother's house to meet Savo. She knocked on the door, Savo answered, and then the assault commenced.

When Wells cross-examined S.W., he questioned her about how she came to be at Savo's mother's house, and he confronted her with her initial account—the version in which Savo grabbed her from off the street as she was walking to Leah Timmerman's house. Moreover, the nurse who was present during S.W.'s sexual assault examination was called as a witness at Savo's trial, and this nurse confirmed that S.W. had initially given this inconsistent version of events (the one in which S.W. claimed that Savo had grabbed her off the street).

In his summation to the jury, Wells reminded the jury of S.W.'s differing accounts of how she arrived at Savo's mother's house, and he used these inconsistencies as one of his bases for arguing that S.W.'s assertion of rape was not credible.

When Judge Torrisi ruled on Savo's petition for post-conviction relief, he faulted Wells for failing to "explore[ ]" the fact that

S.W. "contradicted herself about where she was dropped off right before going to Mr. Savo's house". But, as we have just explained, the record shows that Wells did in fact point out these contradictions when he cross-examined S.W., and Wells later used these contradictions when he argued Savo's case to the jury.

Judge Torrisi concluded that, by failing to make additional efforts to pin down S.W. on the sequence of events that led to her arrival at Savo's mother's house, Wells incompetently failed to elicit evidence "relevant to why [S.W.] may have gone to Mr. Savo's house and to [why] she sought to have him put in jail because of what he had done to their relationship". We do not see how the details under discussion here are pertinent to these two issues, and Judge Torrisi's ruling contains no further explanation of why he believed that Wells's handling of this point was deficient.

We conclude that Wells's cross-examination of S.W. on this point was within the range of competence expected of criminal law practitioners.

*(e) Wells's failure to cross-examine S.W. concerning her assertion that she did not know that Savo's mother would not be home*

When S.W. testified at grand jury, the prosecutor asked her if Savo was the only person (besides S.W.) who was home at the time of the assault:

> *Prosecutor:* Was [Savo] the only person that was home at that time?
>
> *S.W.:* Yeah, ... his mom was out fishing, and his dad was somewhere in Dillingham. I have no clue where [the dad] was, or where his parents were. I know the mom was fishing, so [Savo] was home alone.

But at Savo's trial, S.W. testified that she thought that other people would be present at Savo's mother's house that night. In particular, S.W. testified that she believed that Savo's mother would be there.

When Wells cross-examined S.W. at Savo's trial, he did not confront her with her grand jury testimony on this issue. However, Wells presented the contradiction to the jury

in another manner: Wells elicited testimony from Savo's mother that she (the mother) had told S.W. that she would be out of town.

In Savo's petition for post-conviction relief, he argued that Wells made a critical error by not impeaching S.W. with her grand jury testimony (*i.e.*, her prior testimony that she knew that Savo's mother would not be home). Savo argued that, from the defense viewpoint, it was crucial to show that S.W. knew that she would be alone with Savo—because this would rebut any prosecution claim that S.W. would never have agreed to go to the house unless she thought that other people would be present to protect her from Savo. (Recall that Savo was on bail release at this time, charged with assaulting S.W. in May.)

In his ruling, Judge Torrisi agreed with Savo that this cross-examination would have been relevant on the issue of "why [S.W.] may have gone to Mr. Savo's house". But this was not a disputed issue at Savo's trial. The prosecutor never suggested, during his summation to the jury (either in opening or in rebuttal), that S.W. agreed to go to Savo's mother's house only because she thought that other people would be there to protect her. In fact, during his rebuttal summation, the prosecutor explicitly reminded the jurors of S.W.'s testimony that she had been secretly meeting Savo throughout the summer, and that she had been having sexual relations with Savo (assumedly, in private) up until a few days before the sexual assault—even though both S.W. and Savo knew that one of Savo's conditions of bail prohibited Savo from having any contact with her.

Judge Torrisi did not explain why he believed that the omitted cross-examination had any effect on the outcome of Savo's trial. Even if we construe Judge Torrisi's remarks as an implicit finding that Savo was prejudiced by Wells's failure to cross-examine S.W. on this issue, the record does not support that finding. For the reasons we have just explained, even if we assume that Wells made a mistake when he failed to cross-examine S.W. on this inconsistency, this mistake was insignificant in the context of the issues litigated at Savo's trial.

*(f) Wells's failure to cross-examine S.W. concerning S.W.'s potential intoxication on the night/morning of the sexual assault*

■■■ Another purported deficiency in Wells's performance identified by Judge Torrisi was Wells's failure to cross-examine S.W. as to whether she was intoxicated on the night/morning of the sexual assault. At grand jury, S.W. testified that she "was feeling sick [around the time she went to Savo's mother's house] from having a couple of drinks ... earlier that evening". S.W. also told Officer Varner (the officer who investigated S.W.'s report of rape) that "[she] had partied at [her mother's] house" prior to going to meet Savo. Other witnesses at Savo's trial confirmed that there had been a "party" at S.W.'s mother's house.

In the post-conviction relief litigation, Wells explained that he deliberately chose not to highlight S.W.'s potential intoxication because, when he presented the case to the mock jury, the members of the mock jury "suggested that [he] not bring up the alcohol issue because it would look like Mr. Savo took advantage of an intoxicated woman".

In his ruling, Judge Torrisi did not mention Wells's explanation for his tactical choice, much less find that Wells's tactical choice was incompetent. Judge Torrisi merely noted that evidence of S.W.'s potential intoxication was "relevant to why [S.W.] may have gone to Mr. Savo's [mother's] house". But even if we accept Judge Torrisi's premise that the omitted cross-examination would have been relevant to this issue, this issue was not actively disputed at Savo's trial (as we explained in the last section of this opinion).

Moreover, Wells explained that he had a tactical reason for not raising the issue of S.W.'s potential intoxication. (As noted earlier, when Wells presented Savo's case to the mock jury, the members of the mock jury advised Wells not to bring up this issue "because it would look like Mr. Savo took advantage of an intoxicated woman".)

An attorney's tactical choices are presumed to be competent.[8] In the absence of

---

8. *State v. Jones*, 759 P.2d 558, 569 (Alaska App. 1988).

affirmative proof that Wells's tactical choice in this matter was incompetent, it is irrelevant that Wells chose to forego cross-examination on an issue that he had (competently) decided not to raise.

*(g) Wells's failure to cross-examine S.W. concerning the fact that S.W. had been kicked out of her mother's house and was staying with friends*

■ At the time of (and prior to) the sexual assault in this case, S.W. was living with her friend Leah Timmerman because S.W.'s mother had kicked her out of the house. The fact that S.W. was living with Timmerman, and not with her mother, came out at Savo's trial (both through S.W.'s testimony and through her mother's testimony).

In the post-conviction relief litigation, Savo claimed that Wells should have suggested to the jury that this fact provided a motive for S.W. to invent a tale of rape. Savo asserted that Wells was incompetent for failing to argue that S.W. invented her story of sexual assault for the purpose of winning the sympathy of family and friends, so that S.W.'s mother would allow her to come home again, or so that some other family member or friend would open their door to S.W.

Wells answered that his strategy was to suggest a different motive for S.W. to lie—a motive arising from the fact that Savo was seeing other women. (As noted above, Wells presented testimony at Savo's trial that, earlier in the summer, S.W. had said to Savo, "I'll put you in jail so [that] you can't go running . . . to your [new] little girlfriend's.")

Judge Torrisi apparently adopted Savo's position that Wells made an incompetent choice of strategy—that any competent attorney would have argued the motive that Savo now proposed (S.W.'s desire to obtain a place to live by playing on the sympathy of family and friends) instead of the motive that Wells chose to argue (S.W.'s desire to retaliate against Savo for being unfaithful to her). However, Judge Torrisi did not explain why he believed this to be so.

There is nothing in the record to support Judge Torrisi's ruling. On the face of it, the motive that Wells advanced at trial had much more force than Savo's proposed motive, and there was substantial evidence to support Wells's argument that S.W. was "a woman scorned" who wished to take revenge against Savo. Judge Torrisi's finding that Wells's choice of tactics was incompetent is clearly erroneous.

*(h) Wells's failure to cross-examine S.W. concerning the details of her break-up with Savo*

■ The final purported flaw that Judge Torrisi identified in Wells's performance was Wells's failure to cross-examine S.W. concerning the details of her break-up with Savo. The judge concluded that these details would have been relevant to prove motive— to prove "that [S.W.] sought to have [Savo] put in jail because of what he had done to their relationship."

During the post-conviction relief litigation, when Savo suggested that Wells had been incompetent not to pursue this cross-examination, Wells answered that "[he] did not bring up the details of the break-up [during his cross-examination of S.W.] because numerous witnesses would testify to the rocky nature of their relationship."

And, in fact, several witnesses (both for the State and for the defense) testified that S.W. and Savo had a stormy relationship. Georgette Wilson and Elizabeth Morris testified about Savo's assault on S.W. in May 1999 (the assault that led to the no-contact condition of bail release). Marlene Beltrane testified to another assault that occurred in June 1999. Officer Dennis Varner testified that S.W. told him that, despite these past assaults, she and Savo continued to see each other and have sexual relations until just before the sexual assault in this case. However, Officer Varner further testified that, during the sexual assault examination and interview, S.W. had only one question for him: "How many years is [Savo] going to get for what he did to us?"

In his petition for post-conviction relief, Savo did not explain what other details of the relationship or the break-up he believed Wells should have elicited. And Judge Torrisi (in his ruling) was similarly silent on the question of what details Wells should have

**916**

brought out during his cross-examination of S.W. Moreover, Judge Torrisi failed to address the question of prejudice. That is, Judge Torrisi offered no explanation of how he believed these unspecified omitted details would have significantly bolstered Wells's assertion that S.W. was motivated by revenge to invent a story of rape, or how these unspecified omitted details could have been expected to alter the jury's assessment of Savo's case.

In short, the record does not show that Wells's handling of this issue departed from the standard of competence expected of criminal defense attorneys.

### (i) The issue of cumulative incompetence

In his final order in the post-conviction relief litigation, Judge Torrisi wrote that the various purported deficiencies we have discussed here "together constitute ineffective assistance of counsel". The judge further concluded that there was a reasonable possibility that these deficiencies, in combination, "contributed to [Savo's] conviction".

But the doctrine of cumulative error is really a doctrine of cumulative prejudice. It applies only when real errors have been identified and the remaining question is whether these errors, in combination, were so prejudicial as to undermine the trustworthiness of the underlying judgement (even though each error, taken individually, might not require reversal).[9]

When, as in Savo's case, all of the allegations of error or incompetence are shown to be unfounded, there is no cumulative error.[10]

### Conclusion

The judgement of the superior court is REVERSED. Savo's conviction is reinstated.

---

9. *See Sivertsen v. State,* 963 P.2d 1069, 1073–74 (Alaska App.1998).

10. *Noey v. Bledsoe,* 978 P.2d 1264, 1276 (Alaska 1999); *State v. McDonald,* 872 P.2d 627, 659 (Alaska App.1994); *Drumbarger v. State,* 716 P.2d 6, 16 (Alaska App.1986).